**SNYDER COMMUNICATIONS, L.P., Petitioner,**

v.

**Josefina MAGAÑA, et al., Respondents.**

No. 03–0036.

Supreme Court of Texas.

June 25, 2004.

Joe B. Harrison, Stacy R. Obenhaus, Gardere Wynne Sewell LLP, Dallas, for petitioner.

Bruce W. Hodge, Hodge James & Garza, L.L.P., Lisa Marie Mount, Hodge & James, L.L.P., Harlingen, for respondents.

PER CURIAM.

In this case, we review a trial court order certifying a class action against Snyder Communications, L.P. ("Snyder"), for

damages arising from Snyder's alleged fraud and breach of employment contracts requiring payment of certain commissions and bonuses. The trial court certified the class under Texas Rule of Civil Procedure 42(b)(3), which requires in part that questions of law or fact common to the class predominate over those questions affecting individual class members.[1] The court of appeals affirmed the trial court's certification order.[2] We hold that the trial court abused its discretion in certifying the class because the predominance requirement of Rule42(b)(3) is not met in this case. Accordingly, we reverse the court of appeals' judgment and remand this case to the trial court for further proceedings consistent with this opinion.

Snyder employed local sales representatives in approximately twenty-five states on a commission and bonus basis to sell long-distance telephone services on behalf of its client, AT & T. When a customer agreed to switch from his or her current long-distance provider to AT & T, the representative was required to obtain a Letter of Authorization ("LOA"), which contained information including the customer's name, address, and phone number, as well as the customer's signature authorizing the service switch. Snyder did not accept incomplete LOAs, and no commissions were paid for them. Complete LOAs, however, were forwarded to AT & T for further screening. Pursuant to a written AT & T Sales Associate Commission Plan signed by the sales associate and a Snyder representative, Snyder paid its sales associates commissions for the LOAs that AT & T accepted. AT & T separately paid Snyder for its services, apparently based on the number of accepted LOAs.[3]

When sales representatives commenced employment with Snyder, they were required to sign a document entitled "Snyder Communications—Consumer Markets Sales Procedures and Payment Policies." Among other things, the document outlined situations in which a representative would not receive a commission for a submitted LOA:

**2. Payments of Commissions and Bonuses**

   a) The Company [Snyder] reserves the right to charge back commissions and bonuses for Letters of Authorization (LOAs) that do not meet AT & T standards, parameters, or are paid in advance of a completed and verified sale.

* * *

   d) An employee will not receive commissions from LOAs rejected by data processing. Rejected LOAs will become a Snyder Communications House Account.[4] Parameters for rejected LOAs are incomplete billing address, no name, no signature, invalid/expired promotions, and invalid telephone numbers.

---

1. The trial court (by order dated January 3, 2002) certified the class pursuant to Rule 42(b)(4 ). Effective January 1, 2004, however, subparagraph (b)(3) was deleted from Rule 42, and former subparagraph (b)(4)—with minor changes not pertinent to our decision—is now (b)(3). For ease of reference, we will refer to (b)(3), and those references will mean former subparagraph (b)(4). We note too that, on remand, the trial court proceedings will be governed by the amended rule.

2. 94 S.W.3d 213, 248.

3. It is not entirely clear from the record, but it appears that Snyder generally paid out commissions to its employees only after it received confirmation from AT & T of the service switch.

4. The meaning of the term "Snyder Communications House Account" is not provided in the contract or the record.

e) An employee will not receive commissions from LOAs that are not received at data processing within 7 days from the transaction date on the LOA. LOAs that are more than 7 days old will become a Snyder Communications House Account. (LOAs that are lost/delayed in shipping will be waived from this policy.)

According to Snyder, AT & T would reject an LOA pursuant to its internal parameters if: (1) a customer already had AT & T as his or her long-distance carrier; (2) the LOA was not properly completed; (3) the LOA was a duplicate of one previously submitted; (4) a customer had previously switched long-distance carriers within 90 days of filling out the LOA; or (5) the customer changed his or her mind.

Seven former Snyder employees sued the company for breach of contract and fraud, alleging that Snyder had improperly denied them commissions and bonuses on submitted LOAs and had fraudulently induced the plaintiffs to enter into employment with Snyder by making material misrepresentations regarding payment of commissions and bonuses.

The plaintiffs later amended the petition to allege a class action and, shortly before trial, moved to certify a class of current and former Snyder sales associates who had been denied commissions on submitted LOAs. The plaintiffs argued, among other things, that the class could be certified under Rule 42(b)(3) because common questions of law or fact predominated over questions involving individual members.[5] Specifically, they argued that: (1) all class members had been employed with Snyder on a commission basis and had been denied commissions; (2) the issues of breach of contract and misrepresentation were common to the class; (3) the company-

wide misrepresentations demonstrated a common course of conduct by Snyder; and (4) resolution of the common issues for one class member would resolve them for the entire class. They also pointed to the deposition of Josefina Magaña, one of the plaintiffs, who testified that an unidentified Snyder vice president had told her there was a problem with paying commissions "in the whole company." Snyder filed an opposition to the motion to certify and separately filed motions for summary judgment as to each named plaintiff. In opposing certification, Snyder argued that the named plaintiffs had presented no evidence that class certification was proper. With regard to commonality, Snyder contended that the issue of whether it had improperly denied commissions on submitted LOAs was specific to each claimant because there could be several contractually valid reasons for rejecting a particular LOA.

The trial court conducted a thirty-minute certification hearing and, eight months later, issued an order certifying the following class under Rule 42:

> All persons employed in the United States with Defendant Snyder Communications, L.P., on or after April 3, 1997 in the capacity of a sales associate (also known as a field representative position) and employed to sell the AT & T Long Distance Residential Program who submitted one or more LOAs to Defendant which Defendant did not pay.

In evaluating the predominance requirement set out in Rule 42(b)(3), the trial court stated that "Plaintiffs' petition shows on its face that *all* questions of law and fact affecting the class are common." Specifically, the trial court found that the issues of whether Snyder's actions constituted breach of contract and whether Snyder

---

5. *See* TEX.R. CIV. P. 42(b)(3).

engaged in common-law fraud or misrepresentation were common to the class, stating, "[Snyder]'s alleged misrepresentations are substantially similar and [Snyder] is alleged to have engaged in a common course of conduct." The trial court concluded that if those issues were resolved as to the plaintiffs, they would also be resolved as to all class members. The certification order did not specifically address Snyder's arguments regarding the individual nature of each LOA, but the trial court did state that "[m]any of the arguments of [Snyder] in opposition to certification are merits-based. Merit based determinations are not appropriate at this stage of the litigation."

Snyder appealed, arguing in part that the trial court erred in evaluating the predominance requirement and in ignoring the individual issues raised by Snyder in its answer and summary judgment motions as well as by the plaintiffs' own evidence.[6] The court of appeals affirmed the certification order.[7]

With regard to the predominance requirement, the court of appeals agreed with the trial court's recitation of the predominant substantive legal issues in the case—whether Snyder's actions constituted breach of contract and whether Snyder engaged in common law fraud or misrepresentation.[8] The court of appeals noted that the class members were all Snyder sales associates hired pursuant to identical employment contracts and that a single compensation and bonus policy applied on a company-wide basis.[9] Moreover, the court of appeals said, Snyder did not introduce evidence at the certification hearing to support its contention that individual resolution of each rejected LOA would predominate over the common issues, and "the fact that individual defenses may defeat particular claims does not mean that individual issues predominate."[10] The court of appeals also rejected Snyder's other challenges to the certification order.

As an initial matter, we must determine whether we have jurisdiction to review this interlocutory appeal. Although jurisdiction over interlocutory appeals is generally final in the courts of appeals,[11] under the law in effect at the time the petition in this case was filed,[12] we have jurisdiction to decide an interlocutory appeal when the court of appeals' decision conflicts with a prior decision of another court of appeals or this Court on a question of law material to the decision of the case.[13] In *Henry Schein, Inc. v. Stromboe*, we explained that conflicts jurisdiction can exist when a court of appeals correctly states the law, but misapplies it.[14]

Snyder argues that the court of appeals failed to address in any meaningful way

---

6. Snyder raised several other points of error in the court of appeals, but those issues either were not raised in this Court or are not reached because of our disposition.

7. 94 S.W.3d at 248.

8. *Id.* at 237.

9. *Id.*

10. *Id.*

11. TEX. GOV'T CODE § 22.225(b)(3).

12. The Legislature expanded our jurisdiction over interlocutory appeals by adding subsection (d) to section 22.225 of the Government Code, which provides:

(d) A petition for review is allowed to the supreme court for an appeal from an interlocutory order described by Section 51.014(a)(3) or (6), Civil Practice and Remedies Code. TEX. GOV'T CODE § 22.225(d). That amendment applies to petitions for review filed on or after September 1, 2003.

13. *Id.* "22.001(a)(2), 22.225(c)".

14. 102 S.W.3d 675, 689 (Tex.2002).

how individual issues would be tried and therefore affirmed the certification order even though the trial court did not perform the rigorous analysis required by *Southwestern Refining Company, Inc. v. Bernal*[15] and its progeny, including *Schein.*[16] We agree.

In *Schein,* the trial court concluded:

There are no insurmountable difficulties likely to be encountered in the management of this case, including the management of damage issues. It may be possible to determine damages on a class wide basis from Defendants' records, but if that cannot be done, the Court finds nothing to indicate that damages could not be efficiently determined through proof of claim forms, individual damage hearings, or other manageable means.[17]

In the case before us today, the trial court concluded:

6. Because the breach of contract and representations to class members are virtually identical, proof of liability and damages can be established on a broad basis as to the class, using summaries to documents as permitted by the rules of evidence, expert opinion, or similar methods. A Master may also be used to review documents and determine damages based on a formula.

7. If the trial continues, the jury would also be asked to determine any remaining issues relevant to the class and any classwide defenses raised by Defendant. The jury would also be asked to determine the actual damages for the remaining class members. The next phase will involve the jury's determination of punitive damages for the class members, as authorized by law.[18]

Like the court of appeals in *Schein,* the court of appeals in this case accepted these findings at face value, without ensuring that, in fact, common issues predominate.

The trial court in this case certified the class under former Rule 42(b)(4) (now Rule 42(b)(3)),[19] which allows the maintenance of a class action if:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.[20]

■ In evaluating whether common issues predominate, courts must identify the controlling substantive issues of the case and assess which issues will predominate to determine whether those issues are in

---

**15.** 22 S.W.3d 425, 435 (Tex.2000) (citing *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

**16.** 102 S.W.3d at 689–90.

**17.** *Id.*

**18.** 94 S.W.3d at 246–47 (quoting the trial court's certification order).

**19.** *See supra* note 1.

**20.** Former TEX.R. CIV. P. 42(b)(4).

fact common to the class.[21] Courts must therefore determine "whether common or individual issues will be the object of most of the efforts of the litigants and the court."[22] If there are some common questions of law or fact, but the focus of the litigation will be mainly on individual issues, the court cannot certify the class under Rule 42(b)(3).

■ There are many common issues in this case, most of which are apparently undisputed. For example, Snyder's compensation policies, data processing criteria, commission and bonus schemes, supervisory structure, pay parameters, and LOA standards all applied company wide.[23] The alleged misrepresentation—that all sales associates would receive commissions and bonuses pursuant to the commission plan—would have been the same for all potential class members. Snyder maintains in this Court, however, as it argued in the trial court and the court of appeals, that common issues do not predominate because the only real issue in dispute—whether the plaintiffs in fact suffered an injury—requires resolution on an individual basis. Snyder argues that to prove its liability, each sales representative would need to show that each unpaid LOA submitted to Snyder complied with all the criteria for payment of a commission and that Snyder failed to pay a commission related to each valid LOA. Snyder complains that the trial court failed to identify these individual issues or set out in the trial plan how they would be tried and that the court of appeals erred in accepting the order without requiring "actual" conformance with Rule 42(b)(3).[24]

The plaintiffs counter that the trial court properly found that common issues predominate and that the trial plan gives Snyder the opportunity to present its defenses. The plaintiffs argue, and the court of appeals agreed, that the predominant issues are whether Snyder's actions constitute breach of contract and fraud and that those issues are uniform to all class members.[25] Although the amount of damages might differ for each class member, the plaintiffs contend that all members suffered the same *type* of damages, which could be calculated using document summaries and formulas, as stated in the trial plan contained in the certification order. The court of appeals concluded that calculating the damages would be "a largely mechanical task."[26]

We agree with Snyder that the primary issue in dispute—whether Snyder failed to pay earned commissions to its sales associates—is highly individualized because of the many criteria a particular LOA had to meet before Snyder and then AT & T accepted it. Failure to pay a commission on a submitted LOA in and of itself would not constitute a breach of the parties' contract. To prove Snyder's liability on either the fraud or breach of contract claim, the plaintiffs would have to show that Snyder rejected valid LOAs or failed to pay commissions to its representatives on accepted LOAs for which AT & T in fact compensated Snyder and for reasons other than those provided in the parties' agreement. For example, assume the estimated 4,000 class members each submitted 100 LOAs that were rejected and for which the class member received no commissions.

21. *Bernal,* 22 S.W.3d at 434.

22. *Id.; Schein,* 102 S.W.3d at 693.

23. 94 S.W.3d at 233.

24. *Bernal,* 22 S.W.3d at 435.

25. 94 S.W.3d at 237.

26. *Id.* at 247 (quoting *Smith v. MCI Telecomms. Corp.,* 124 F.R.D. 665, 678 (D.Kan. 1989)).

Each LOA could have been rejected for one or more of the following reasons: (1) it contained incomplete or inaccurate information; (2) it was not received at data processing within seven days of the transaction date; (3) it was a duplicate of a previously submitted LOA; (4) the customer already used AT & T; (5) the customer had previously switched carriers within 90 days; or (6) the customer changed his or her mind after filling out the LOA.

Evaluating whether a class member was improperly denied commissions would thus require an examination of not only *each* disputed LOA but also Snyder's and perhaps AT & T's records because a determination of whether commissions were due and owing will not be apparent from the face of an LOA. This inquiry obviously will have to take place for every disputed LOA because improper rejection of an LOA submitted by one sales associate does not automatically establish that any other LOA, whether submitted by the same or a different employee, was also improperly rejected.[27] The trial court provided no meaningful answer as to how these issues could be tried "in a manageable, time-efficient, yet fair manner."[28] The plaintiffs' vague allegation in their petition of a "common course of conduct" and Magaña's brief testimony that an unidentified Snyder officer told her there was a commission problem "in the whole company" do not relieve the plaintiffs of their burden to demonstrate that common issues predominate.

The trial court dismissed Snyder's arguments as "merit-based" and therefore inappropriate for consideration at the certification stage, and the court of appeals agreed.[29] But that reasoning is flawed. While a review of the evidence to determine whether Snyder could actually account for each unpaid LOA would have been "merit-based" and premature,[30] Snyder's arguments regarding the kind of proof necessary to establish Snyder's liability are highly relevant to understanding "the substantive issues of the case that will control the outcome of the litigation."[31]

The court of appeals also held that Snyder failed to include its summary judgment materials in the certification record and that Snyder had not introduced any material at the certification hearing to support its contention about the individual nature of each LOA.[32] We need not determine whether this was error, however, because Snyder's arguments in its opposition to the certification motion, combined with the evidence introduced by the plaintiffs, were sufficient to defeat predominance. Snyder's written, signed payment policy set forth several reasons why an LOA would be rejected, and Snyder's budget director testified in his deposition that although the LOA standards applied company wide, there were various reasons for denying an LOA.

The record simply does not demonstrate that the predominant issue in this case is common to the class. Given the large

27. *Cf. Hindman v. Tex. Lime Co.,* 157 Tex. 592, 305 S.W.2d 947, 953 (1957) (in action by several car dealers for damages to cars from emission of lime dust, plaintiffs could not rely on a small number of examples of damages to specific cars to prove amount of damages as to other damaged vehicles).

28. *Bernal,* 22 S.W.3d at 436.

29. *94 S.W.3d at 236–37.*

30. *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996) (noting that a preliminary inquiry into the merits of the case is improper because the strength of the plaintiff's claim should not affect the certification decision).

31. *Bernal,* 22 S.W.3d at 434.

32. 94 S.W.3d at 228–30, 237.

number of LOAs submitted and the various contractually designated reasons for rejecting any given one, it is clear that "individual issues will be the object of most of the efforts of the litigants and the court." [33]

Because the plaintiffs failed to demonstrate compliance with Rule 42(b)(3)'s predominance requirement, we need not reach Snyder's other challenges to the certification order or the trial plan.

\* \* \* \* \* \*

We hold that the trial court abused its discretion in certifying the class under Rule 42(b)(3) in this case. Accordingly, without hearing oral argument,[34] we reverse the court of appeals' judgment and remand this case to the trial court for further proceedings consistent with this opinion.

---

**33.** *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 693 (Tex.2002); *Bernal,* 22 S.W.3d at 434.

**34.** TEX.R.APP. P. 59.1.