NUMBER 13-04-008-CV
COURT OF APPEALS
THIRTEENTH DISTRICT OF TEXAS
CORPUS CHRISTI – EDINBURG

 
FIDELITY AND GUARANTY LIFE 
INSURANCE COMPANY,                                                             Appellant,
v.

REBECCA PINA, FRANCISCA MORALES
AND ROSA G. CORTEZ,                                                             Appellees.


 
On appeal from the 139th District Court
of Hidalgo County, Texas.

 
 
 O P I N I O N
 
     Before Chief Justice Valdez and Justices Castillo and Garza
 
                             Opinion by Chief Justice Valdez 
         Appellant, Fidelity and Guaranty Life Insurance Company (“F&G”), brings this
interlocutory appeal from an order of the trial court certifying a class action in a consumer
fraud case. Because appellees, Rebecca Pina, Francisca Morales, and Rosa G. Cortez,
have failed to provide evidence of class-wide reliance on F&G’s misrepresentation
regarding the characteristics of its annuities, we reverse and remand. 
The Maximus Annuities
          Appellees are teachers at the Edcouch-Elsa Independent School District in Texas. 
They each individually purchased 403(b) fixed annuities known as “Maximus” annuities
which were sold by F&G as retirement investments.


 The Maximus annuities were fixed
deferred annuities with an accumulation phase and a payout phase. During the
accumulation phase, a policyholder would contribute money either through a lump sum or
periodic deposits. During the payout or “annuitization” phase, the policyholder begins to
draw payments from the annuity. The Maximus annuities were specifically intended as a
retirement supplement for employees of public schools; the teachers would typically pay
regular amounts from their paychecks into the annuity over a period of many years. This
would generate interest and grow into a more significant amount which could be drawn
from upon the teachers’ retirement. 
          F&G, an insurance company, entered the 403(b) market in the early 1990s,
establishing an exclusive “Agency and Distribution Agreement” with R. W. Durham &
Company. In exchange for supplying customers for its annuities, F&G would pay Durham
various amounts according to a schedule of commissions. The commissions paid to
Durham for its services were allegedly on the “high end” of industry practice, and F&G was
consequently required to design an annuity product with a high profit margin. 
          F&G ultimately designed the Maximus annuities with a high front-loaded interest
rate. All money deposited into the Maximus account would be assigned the “current
money interest rate” for the first year it was held in the account. This rate was to be higher
than the industry standard and therefore attract a large amount of customers, and was
sometimes referred to as the “teaser” rate. After the first year, however, all deposits would
be considered “old money” and assigned a different, much lower rate of interest. 
Statements sent by F&G to customers did not disclose the exact old money interest rate,
but included the following statement: “THE CURRENT INTEREST RATE ON NEW
MONEY IS: 7.25% [example]. Current interest rates declared for new premiums include
some bonus interest during the first twelve months. A different rate may be credited after
the first twelve months.”


 The interest rate on new money for the named plaintiffs
averaged around 7.25%; the old money rates were typically between 3.5 and 4%. The
Maximus annuities also had substantial long-term surrender penalties, in order to retain
customers once deposits began. 
          The Maximus annuities were sold to teachers in Texas, California, Connecticut, New
Jersey and Oklahoma for several years. In 1998, however, Durham signed a new
distribution agreement with another company, and F&G terminated its arrangement with
Durham and withdrew from the 403(b) market in December of 1999. 
The Class Certification Hearing
          The named plaintiffs all purchased their annuities through Durham agents. It was
allegedly not disclosed to them at any point that the high introductory interest rates paid
on their money would decline after the first year. Upon discovering the new money/old
money-design of their annuity, they filed suit against F&G under various provisions of the
Deceptive Trade Practices Act, Texas Insurance Code, and common law claims of fraud
and misrepresentation. They also requested class certification of all purchasers of the
Maximus annuities pursuant to Texas Rule of Civil Procedure 42(a) and (b)(3). See Tex.
R. Civ. P. 42. The named plaintiffs alleged that they should be permitted to sue on behalf
of all Maximus purchasers because (1) the class was so numerous that joinder of all
members in an individualized basis was impracticable, (2) there were questions of law or
fact common to the class, (3) the claims of the representative policyholder parties were
typical of the claims of the class, and (4) the representative parties would fairly and
adequately protect the interests of the class. 
          Judge Leticia Hinojosa of the 139th District Court conducted a two-day hearing on
the class certification issue. On December 19, 2003, Judge Hinojosa entered an order
certifying the class, defining the class as “All fixed annuities sold by F&G through [Durham]
under the trade names Maximus I, Maximus II, Maximus X, Maximus XV, and Maximus
SP.”


 The class was certified with respect to the claims arising under the consumer
protection statutes and insurance codes of Texas, California, Connecticut, New Jersey and
Oklahoma.


 The request to certify the fraud and negligent misrepresentation claims were
denied. 
          Judge Hinojosa’s order of certification did not include legal or factual findings, nor
did it include a trial plan. On January 8, 2004, Judge Hinojosa resigned from the bench
without entering any further orders. The case was then transferred by the local
administrative judge to Judge Noe Gonzalez of the 370th District Court. Judge Gonzalez
indicated that he would review the paper record from the hearing. After conducting this
review, Judge Gonzalez issued findings of fact and conclusions of law as well as a trial
plan. The trial plan contemplated five sets of jury instructions in order to handle the claims
arising from five different states. 
          F&G now appeals from the certification order in three issues: (1) because individual
issues of causation, reliance, and the discovery rule predominate over common issues, the
trial court abused its discretion in certifying a consumer fraud class; (2) a class action is not
superior to other available methods for the fair and efficient adjudication of the controversy,
and the trial court therefore abused its discretion in certifying a class; and (3) because the
trial court that entered the trial plan did not hear the evidence presented at the class
certification hearing, the trial court failed to perform a rigorous analysis of the requirements
for class certification, and thus abused its discretion in certifying a class. 
Successor Judges
          We first address F&G’s third issue, which asserts that the required rigorous analysis
of the class certification request was not performed. In a class certification proceeding, the
trial court must perform a rigorous analysis to determine whether all the prerequisites to
class certification have been met and how the claims will be tried. See Southwestern Ref.
Co. v. Bernal, 22 S.W.3d 425, 435 (Tex. 2000).
          F&G complains that under the rigorous analysis rule, Judge Gonzalez should not
have entered findings of fact and conclusions of law in support of Judge Hinojosa’s class
certification order without hearing evidence. F&G cites to the rules of civil procedure for
support of its contention, arguing that although Texas Rule of Civil Procedure 18 allows the
successor to a retired or deceased judge to hear and determine undisposed motions and
to approve “statements of facts,” the rule does not allow a successor judge to enter
findings of fact and conclusions of law without hearing evidence. See Tex. R. Civ. P. 18. 
F&G also cites to W.C. Banks, Inc. v. Team, Inc., 783 S.W.2d 783, 784 (Tex.
App.–Houston [1st Dist] 1990, no writ) and Bexar County Ice Cream Co., Inc. v. Swensen’s
Ice Cream Co., 859 S.W.2d 402, 404 (Tex. App.–San Antonio 1993, writ denied), overruled
on other grounds by Barraza v. Koliba, 933 S.W.2d 164, 167 (Tex. App.–San Antonio
1996, writ denied), in support of its claim that successor judges are prevented from issuing
findings and conclusions in cases initiated by their predecessors without hearing evidence.
          We disagree with F&G’s interpretation of the law. Rule 18 allows successor judges
to dispose of unresolved matters and enter various orders so long as the successor judge
does not render judgment without hearing evidence. See Tex. R. Civ. P. 18. Although
findings of fact and conclusions of law are not specifically discussed in this rule, rule 18
operates in conjunction with section 30.002 of the remedies code, which allows the
successor of a deceased judge to enter findings of fact and conclusions of law for cases
pending at the death of his predecessor. See Tex. Civ. Prac. & Rem. Code Ann. §
30.002(b) (Vernon 1997). While neither of these rules addresses this exact situation in
which a judge resigns from the bench and the case is transferred, both of them imply that
so long as an order has been entered, successor judges may enter findings of fact and
conclusions of law. This conclusion is strongly supported by the holding in Lykes Bros.
Steamship Co., Inc. v. Benben, 601 S.W.2d 418, 420 (Tex. Civ. App.–Houston [14th Dist.]
1980, writ ref’d n.r.e.), in which the Houston appellate court found no error when a
successor judge entered findings of fact and conclusions of law after the predecessor
judge had resigned from the bench. 
          Furthermore, the cases cited by F&G as support are not on point, as neither of them
involved a case in which judgment had already been fully rendered. In W.C. Banks, after
a hearing presided over by the original judge, a successor judge signed the final judgment
without hearing evidence. See W.C. Banks, 783 S.W.2d at 786. The appellate court ruled
this was impermissible. Id. Likewise, in Swensen’s Ice Cream, the original judge
pronounced judgment orally from the bench but then died before the judgment was
reduced to writing. See Swensen’s Ice Cream, 859 S.W.2d at 404. The successor judge
not only entered final judgment but also expanded on the earlier pronounced judgment
without hearing any additional evidence. Id. The appellate court, noting that “a judge who
has heard no evidence cannot rule on a case,” simply treated the additional terms of the
judgment entered by the successor as a nullity, relying only on the oral pronouncement
from the deceased judge. Id. 
          Here, Judge Hinojosa resigned from the bench after duly entering a final order of
class certification. Judge Gonzalez then thoroughly reviewed the record from the
proceedings presided over by Judge Hinojosa and entered findings of fact and conclusions
of law in support of the previously rendered judgment. Judge Gonzalez did not expand or
limit in any way Judge Hinojosa’s ruling or the class certification order. Although this
situation is not directly addressed by the rules of civil procedure, Judge Gonzalez’s actions
were a reasonable interpretation and application of the rules so as to avoid unnecessary
relitigation of already resolved issues. See Sharp v. International Business Machines
Corp., 927 S.W.2d 790, 795 (Tex. App.–Austin 1996, writ denied) (allowing relaxation of
strict procedural requirements in the interests of judicial efficiency). We therefore conclude
that it was not an abuse of discretion for the trial court to enter its findings of fact and
conclusions of law without hearing additional evidence, and we accordingly overrule this
issue on appeal.
Class Certification
          We now turn to F&G’s primary contention on appeal: whether the trial court erred
in granting the order to certify the consumer class.
          Our review of an interlocutory appeal from a class certification order is limited to
determining whether the trial court’s order constituted an abuse of discretion. Ford Motor
Co. v. Ocanas, 138 S.W.3d 447, 451 (Tex. App.–Corpus Christi 2004, no pet.); see also
Henry Schein, Inc. v. Stomboe, 102 S.W.3d 675, 690-91 (Tex. 2002). Although we discuss
the propriety of the class certification in light of the claims asserted by the named plaintiffs
(i.e., misrepresentation of the design of the Maximus annuities), we are in no way
evaluating the merits of these claims. See Intratex Gas Co. v. Beeson, 22 S.W.3d 398,
404 (Tex. 2000) ("Deciding the merits of the suit in order to determine its maintainability
as a class action is not appropriate.").
          Typically under this standard of review, the appellate court must indulge every
presumption favorable to the trial court’s ruling.  See Graebel/Houston Movers, Inc. v.
Chastain, 26 S.W.3d 24, 29 (Tex. App.–Houston [1st Dist.] 2000, pet dism’d w.o.j.). On
certification issues, however, the appellate court is not bound by this presumption and must
independently determine whether the requirements of rule 42 have been fully satisfied. 
See Ford Motor Co., 138 S.W.3d at 451; see also Henry Schein, 102 S.W.3d at 691;
Bernal, 22 S.W.3d at 435 (determining that actual compliance with rule 42 “must be
demonstrated; it cannot be presumed”). 
          Under rule 42(a), every class action must satisfy four threshold requirements:
numerosity, commonality, typicality, and adequacy of representation. See Tex. R. Civ. P.
42(a). Then, in addition to satisfying these four requirements, the class certification must
also satisfy at least one of the subparts of rule 42(b). See Tex. R. Civ. P. 42(b). In their
motion for class certification, appellees alleged that their motion for class certification was
maintainable pursuant to rule 42(b)(3), which permits class actions when common
questions of law or fact predominate and a class action is superior to other forms of
adjudication. See id. 
          F&G contests the adequacy of the class’s compliance with the 42(b)(3) requirement
of predominance and superiority. We first consider the predominance requirement
because it is one of the most stringent prerequisites to class certification. See Ford Motor
Co., 138 S.W.3d at 452. In evaluating whether common issues predominate, courts must
identify the controlling substantive issues of the case and assess which issues will
predominate to determine whether those issues are in fact common to the class. Snyder
Communications, L.P. v. Magana, 142 S.W.3d 295, 300-01 (Tex. 2004). Courts must
therefore determine whether common or individual issues will be the object of most of the
efforts of the litigants and the court. Id. at 301. If there are some common questions of
law or fact, but the focus of the litigation will be mainly on individual issues, the court
cannot certify the class under rule 42(b)(3). Id. We therefore must identify the major
issues which will be the focus of the litigation.
          Under the Deceptive Trade Practices Act in Texas, a consumer may maintain an
action for economic damages or damages for mental anguish against a party who has
used or employed a false, misleading or deceptive act or practice relied on by a consumer
to the consumer’s detriment. See Tex. Bus. & Com. Code Ann. § 17.50(a) (Vernon 2002). 
In California, a consumer may maintain an action under the Consumers Legal Remedies
Act if the consumer suffered damages as a result of reliance upon another party’s
misrepresentation regarding the quality or characteristics of goods or products. See Cal.
Civ. Code §1770 (Deering 2005); see also Wilens v. TD Waterhouse Group, Inc., 120 Cal.
4th 746, 755 (Cal. App. 2003). Establishing liability in both these states under the
consumer protection laws requires that there be a finding that the consumer relied on the
misrepresentation. An overwhelming majority of the class membership hails from these
two states (88%), indicating that reliance will be a major focus of the litigation. Accordingly,
this Court must determine if reliance will be a common and predominant issue, justifying
class certification, or an individual issue. See Snyder Communications, 142 S.W.3d at
301. It is particularly difficult to establish commonality and predominance of reliance in a
group setting because, as one court noted: 
Reliance is a thought process or one step in a larger thought process; . . . [it]
can be shown only by demonstrating the person's thought processes in
reaching the decision. Proof of reliance or lack of reliance necessarily
requires an individualized determination because, under all the same facts
and circumstances, one person may have relied on the misrepresentation in
reaching a decision while another did not rely on it in reaching the same
decision.
 
Grant Thornton, L.L.P. v. Suntrust Bank, 133 S.W.3d 342, 355 (Tex. App.–Dallas 2004,
pet. filed) (emphasis added).
          In the Henry Schein opinion, the Texas Supreme Court severely limited the ability
of potential plaintiffs to form a class when the issue of reliance is of importance to the
resolution of the class claim. According to the holding in Henry Schein, reliance upon
misrepresentations made to consumers must be proved with class-wide proof; class-wide
proof requires the existence of class-wide evidence. See Schein, 102 S.W.3d at 693. 
Class-wide evidence requires that there be no differences in how individual members of
the class relied on the misrepresentation. Id. at 693 (“Inescapably individual differences
cannot be concealed in a throng.”). The court did not entirely preclude class actions in
which reliance was an issue, but it did make such cases a near-impossibility:
If a plaintiff could prove reliance in an individual action with the same
evidence offered to show class-wide reliance, then the issue is one of law
and fact common to the class. The question the court must decide before
certifying a class, after rigorous analysis and not merely a lick and a prayer,
is whether the plaintiffs have demonstrated that they can meet their burden
of proof in such a way that common issues predominate over individual ones. 
    
Id. at 694. Under this standard, it is not enough to demonstrate that a defendant wanted
purchasers to rely on its misrepresentations in choosing or staying with a particular
product; instead there must be evidence that the purchasers actually did rely on the
misrepresentations “so uniformly that common issues of reliance predominate over
individual issues.” Id. In the case of Henry Schein, there was “significant evidence that
purchasers relied on recommendations from colleagues and others rather than any
statements made directly or indirectly by [the defendant].” Id. 
          The Henry Schein test for class-wide reliance was applied by this Court in the Ford
Motor Co. opinion, in which the named plaintiffs attempted to certify a class of all
consumers who had purchased F-150 trucks with a Class III towing package. Ford Motor
Co., 138 S.W.3d at 450. The Class III package was advertised as including a special,
larger radiator but actually was sold with only the base radiator. Id. The trial court certified
a class consisting of all purchasers of the F-150 with the Class III towing package;
however, relying on Henry Schein, we reversed and remanded the certification order
because there was no evidence presented showing that all purchasers actually relied
uniformly on Ford’s promise of a larger radiator in making their purchase. Id. at 453. 
Despite the fact that the misrepresentation clearly occurred and the purchases were then
made by all class members, the class also had to show that every purchaser relied on the
misrepresentation in making the purchase. Id. 
          In the current case before us, the three named plaintiffs all provided deposition
testimony regarding their reasons for purchasing the Maximus annuity. Rebecca Pina,
when questioned as to her reasons for purchasing the Maximus annuity, replied “Because
I liked the 7.2 [percent interest rate]. When I saw that number, I said, it’s earning pretty
good interest.” Rosa Cortez, when asked the same question, said “Well, it was the interest
rate, the 7.25 that caught my eye. I purchased it.” When questioned further on what she
would have done if she had realized at the time that the introductory interest rate would
only apply to new money, Ms. Cortez answered, “I don’t know what I would have done back
then.” Francisca Morales was asked by counsel: “The representation made to you that you
were going to get 7.25 percent was what you relied on in deciding to buy the product,
correct?” She replied “Correct.” During the same deposition, however, Ms. Morales noted
that had the interest rate been 6 percent instead of 7.25, that rate “was just as good as 7,
in my opinion.” Although all of the named plaintiffs noted that the new money interest rate
presented to them was the reason they initially invested in the Maximus annuity, none of
them specifically stated that they actually relied on the interest rate to both remain constant
and apply to all monies deposited. 
          Here, the named plaintiffs provided some evidence that they all relied on the new
money interest rate when making their purchases. Each individual’s reliance, however,
was highly personalized; two of the plaintiffs indicated that the interest rate could have
been different or temporary and this may not have affected their purchase. Furthermore,
there was no evidence demonstrating class-wide uniform reliance by all purchasers. The
trial court’s findings of fact and conclusions of law noted that “there was class-wide
evidence that Class members purchased annuities primarily due to the initial interest rate;”
however, there was no discussion of what that class-wide evidence may have been, and
appellees do not direct us to any such evidence in the record. Instead, appellees re-direct
us to the above-mentioned testimony of the three named plaintiffs, each of which display
differences and do not indicate how or whether other members of the class may have
weighed the importance of the new money interest rate in making their investment
decision. Indeed, it is difficult to imagine what could possibly qualify in this case as class-wide evidence of reliance on F&G’s misrepresentations. Furthermore, we question
whether there is any way, given the individualized nature of reliance, that a Deceptive
Trade Practices Act-based claim premised on misrepresentation could ever be certifiable
as a class action under the rule enunciated in Henry Schein. Although Henry Schein
appears to hold open the possibility, there is yet to be a case that has reached the courts
of appeals in Texas since the Henry Schein opinion that has encountered a situation in
which class-wide proof of reliance could be found. 
Conclusion
          We do not say that “no class can be certified in this case; that matter must be
decided by the trial court in the first instance.” Henry Schein, 102 S.W.3d at 701; Ford
Motor Co., 138 S.W.3d at 454. We limit our conclusion to holding only that appellees failed
to show that individualized determinations of reliance would not predominate over common
questions of law or fact. Ford Motor Co., 138 S.W.3d at 454.
          Given our holding on this issue, we decline to address appellant’s remaining issues
on appeal. See Tex. R. App. P. 47.1. We reverse the judgment of the trial court and
remand for further proceedings. 
 

                                                                                                                                
                                                                                      Rogelio Valdez,
                                                                                      Chief Justice

 
Opinion delivered and filed
this 28th day of April, 2005.