**FIDELITY AND GUARANTY LIFE INSURANCE COMPANY,**
Appellant,

v.

**Rebecca PINA, Francisca Morales and Rosa G. Cortez, Appellees.**

No. 13–04–008–CV.

Court of Appeals of Texas,
Corpus Christi–Edinburg.

April 28, 2005.

Rehearing Overruled July 14, 2005.

Jaime Saenz, Brownsville, L. Joseph Loveland, Atlanta, GA, Michael W. Youtt, Kevin D. Mohr, Houston, for Appellant.

G. Wade Caldwell, Martin, Drought & Torres, Inc., Cori R. Conner, San Antonio, David N. Calvillo, McAllen, for Appellee.

Before Chief Justice VALDEZ and Justices CASTILLO and GARZA.

## OPINION

Opinion by Chief Justice VALDEZ.

Appellant, Fidelity and Guaranty Life Insurance Company ("F & G"), brings this interlocutory appeal from an order of the trial court certifying a class action in a consumer fraud case. Because appellees, Rebecca Pina, Francisca Morales, and Rosa G. Cortez, have failed to provide evidence of class-wide reliance on F & G's misrepresentation regarding the characteristics of its annuities, we reverse and remand.

### The Maximus Annuities

Appellees are teachers at the Edcouch–Elsa Independent School District in Texas. They each individually purchased 403(b) fixed annuities known as "Maximus" annuities which were sold by F & G as retirement investments.[1] The Maximus annuities were fixed deferred annuities with an accumulation phase and a payout phase. During the accumulation phase, a policyholder would contribute money either through a lump sum or periodic deposits. During the payout or "annuitization" phase, the policyholder begins to draw payments from the annuity. The Maximus annuities were specifically intended as a retirement supplement for employees of public schools; the teachers would typically pay regular amounts from their paychecks into the annuity over a period of many years. This would generate interest and grow into a more significant amount which could be drawn from upon the teachers' retirement.

F & G, an insurance company, entered the 403(b) market in the early 1990s, establishing an exclusive "Agency and Distribution Agreement" with R.W. Durham & Company. In exchange for supplying customers for its annuities, F & G would pay Durham various amounts according to a

---

1. F & G sold five different types of Maximus annuities to the class members: Maximus I, Maximus II, Maximus X, Maximus XV, and Maximus SP. The overall design and basic features of these annuities were all the same and any differences between them were irrelevant for purposes of this litigation.

schedule of commissions. The commissions paid to Durham for its services were allegedly on the "high end" of industry practice, and F & G was consequently required to design an annuity product with a high profit margin.

F & G ultimately designed the Maximus annuities with a high front-loaded interest rate. All money deposited into the Maximus account would be assigned the "current money interest rate" for the first year it was held in the account. This rate was to be higher than the industry standard and therefore attract a large amount of customers, and was sometimes referred to as the "teaser" rate. After the first year, however, all deposits would be considered "old money" and assigned a different, much lower rate of interest. Statements sent by F & G to customers did not disclose the exact old money interest rate, but included the following statement: "THE CURRENT INTEREST RATE ON NEW MONEY IS: 7.25% [example]. Current interest rates declared for new premiums include some bonus interest during the first twelve months. A different rate may be credited after the first twelve months."[2] The interest rate on new money for the named plaintiffs averaged around 7.25%; the old money rates were typically between 3.5 and 4%. The Maximus annuities also had substantial long-term surrender penalties, in order to retain customers once deposits began.

The Maximus annuities were sold to teachers in Texas, California, Connecticut, New Jersey and Oklahoma for several years. In 1998, however, Durham signed a new distribution agreement with another company, and F & G terminated its arrangement with Durham and withdrew from the 403(b) market in December of 1999.

### The Class Certification Hearing

The named plaintiffs all purchased their annuities through Durham agents. It was allegedly not disclosed to them at any point that the high introductory interest rates paid on their money would decline after the first year. Upon discovering the new money/old money-design of their annuity, they filed suit against F & G under various provisions of the Deceptive Trade Practices Act, Texas Insurance Code, and common law claims of fraud and misrepresentation. They also requested class certification of all purchasers of the Maximus annuities pursuant to Texas Rule of Civil Procedure 42(a) and (b)(3). *See* Tex.R. Civ. P. 42. The named plaintiffs alleged that they should be permitted to sue on behalf of all Maximus purchasers because (1) the class was so numerous that joinder of all members in an individualized basis was impracticable, (2) there were questions of law or fact common to the class, (3) the claims of the representative policyholder parties were typical of the claims of the class, and (4) the representative parties would fairly and adequately protect the interests of the class.

Judge Leticia Hinojosa of the 139th District Court conducted a two-day hearing on the class certification issue. On December 19, 2003, Judge Hinojosa entered an order certifying the class, defining the class as "All fixed annuities sold by F & G through [Durham] under the trade names Maximus I, Maximus II, Maximus X, Maximus XV, and Maximus SP."[3] The class was certified

---

**2.** Before 1997, statements read "A different rate *will* be credited after the first twelve months" (emphasis added).

**3.** The order excluded from the class the following parties: (1) any annuity sold by Durhan agents to employees of private schools or other private employers, who would not be governed under the governmental plan ex-

with respect to the claims arising under the consumer protection statutes and insurance codes of Texas, California, Connecticut, New Jersey and Oklahoma.[4] The request to certify the fraud and negligent misrepresentation claims were denied.

Judge Hinojosa's order of certification did not include legal or factual findings, nor did it include a trial plan. On January 8, 2004, Judge Hinojosa resigned from the bench without entering any further orders. The case was then transferred by the local administrative judge to Judge Noe Gonzalez of the 370th District Court. Judge Gonzalez indicated that he would review the paper record from the hearing. After conducting this review, Judge Gonzalez issued findings of fact and conclusions of law as well as a trial plan. The trial plan contemplated five sets of jury instructions in order to handle the claims arising from five different states.

F & G now appeals from the certification order in three issues: (1) because individual issues of causation, reliance, and the discovery rule predominate over common issues, the trial court abused its discretion in certifying a consumer fraud class; (2) a class action is not superior to other available methods for the fair and efficient adjudication of the controversy, and the trial court therefore abused its

discretion in certifying a class; and (3) because the trial court that entered the trial plan did not hear the evidence presented at the class certification hearing, the trial court failed to perform a rigorous analysis of the requirements for class certification, and thus abused its discretion in certifying a class.

### Successor Judges

■ We first address F & G's third issue, which asserts that the required rigorous analysis of the class certification request was not performed. In a class certification proceeding, the trial court must perform a rigorous analysis to determine whether all the prerequisites to class certification have been met and how the claims will be tried. *See Southwestern Ref. Co. v. Bernal,* 22 S.W.3d 425, 435 (Tex.2000).

■ F & G complains that under the rigorous analysis rule, Judge Gonzalez should not have entered findings of fact and conclusions of law in support of Judge Hinojosa's class certification order without hearing evidence. F & G cites to the rules of civil procedure for support of its contention, arguing that although Texas Rule of Civil Procedure 18 allows the successor to a retired or deceased judge to hear and determine undisposed motions and to ap-

---

emption under ERISA; (2) all present or former officers or directors of F & G since January 1, 1993; (3) all persons who surrendered their annuities (a) more than four years before the suit was filed for policyholders in Texas, (b) more than three years before the suit was filed for policyholders in California, Connecticut and Oklahoma, and (c) more than six years before the suit was filed for class members in New Jersey; (4) all persons who, while represented by an attorney, have signed a release of F & G for the claims made in this suit; (5) all policyholders who have died and F & G had paid a death benefit under the annuity; and (6) any group contract holder where the annuities were sold through individual certificates.

**4.** Claims based on consumer protection statutes were certified as follows.

Texas: Texas Business and Commerce Code § 17.46(b)(5), (7), and (24) and § 17.45(5); Texas Insurance Code article 21.21.
California: California Civil Code (Consumers Legal Remedies Act) § 1770(a)(5), (7), and (14)
Connecticut: Connecticut General Statute, § 42–110b(a) and applicable regulations established under § 42–110b(c).
New Jersey: New Jersey Statutes §§ 56:8–2, 56:8–2.2 and 56:8–19.
Oklahoma: 15 Oklahoma Statutes §§ 751, 752(14), and 753(5), (7) and (20).

prove "statements of facts," the rule does not allow a successor judge to enter findings of fact and conclusions of law without hearing evidence. *See* TEX.R. CIV. P. 18. F & G also cites to *W.C. Banks, Inc. v. Team, Inc.*, 783 S.W.2d 783, 784 (Tex.App.-Houston [1st Dist] 1990, no writ) and *Bexar County Ice Cream Co., Inc. v. Swensen's Ice Cream Co.*, 859 S.W.2d 402, 404 (Tex.App.-San Antonio 1993, writ denied), *overruled on other grounds by Barraza v. Koliba*, 933 S.W.2d 164, 167 (Tex.App.-San Antonio 1996, writ denied), in support of its claim that successor judges are prevented from issuing findings and conclusions in cases initiated by their predecessors without hearing evidence.

We disagree with F & G's interpretation of the law. Rule 18 allows successor judges to dispose of unresolved matters and enter various orders so long as the successor judge does not render judgment without hearing evidence. *See* TEX.R. CIV. P. 18. Although findings of fact and conclusions of law are not specifically discussed in this rule, rule 18 operates in conjunction with section 30.002 of the remedies code, which allows the successor of a deceased judge to enter findings of fact and conclusions of law for cases pending at the death of his predecessor. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 30.002(b) (Vernon 1997). While neither of these rules addresses this exact situation in which a judge resigns from the bench and the case is transferred, both of them imply that so long as an order has been entered, successor judges may enter findings of fact and conclusions of law. This conclusion is strongly supported by the holding in *Lykes Bros. Steamship Co., Inc. v. Benben*, 601 S.W.2d 418, 420 (Tex.Civ.App.-Houston [14th Dist.] 1980, writ ref'd n.r.e.), in which the Houston appellate court found no error when a successor judge entered findings of fact and conclusions of law after the predecessor judge had resigned from the bench.

Furthermore, the cases cited by F & G as support are not on point, as neither of them involved a case in which judgment had already been fully rendered. In *W.C. Banks*, after a hearing presided over by the original judge, a successor judge signed the final judgment without hearing evidence. *See W.C. Banks*, 783 S.W.2d at 786. The appellate court ruled this was impermissible. *Id.* Likewise, in *Swensen's Ice Cream*, the original judge pronounced judgment orally from the bench but then died before the judgment was reduced to writing. *See Swensen's Ice Cream*, 859 S.W.2d at 404. The successor judge not only entered final judgment but also expanded on the earlier pronounced judgment without hearing any additional evidence. *Id.* The appellate court, noting that "a judge who has heard no evidence cannot rule on a case," simply treated the additional terms of the judgment entered by the successor as a nullity, relying only on the oral pronouncement from the deceased judge. *Id.*

Here, Judge Hinojosa resigned from the bench after duly entering a final order of class certification. Judge Gonzalez then thoroughly reviewed the record from the proceedings presided over by Judge Hinojosa and entered findings of fact and conclusions of law in support of the previously rendered judgment. Judge Gonzalez did not expand or limit in any way Judge Hinojosa's ruling or the class certification order. Although this situation is not directly addressed by the rules of civil procedure, Judge Gonzalez's actions were a reasonable interpretation and application of the rules so as to avoid unnecessary relitigation of already resolved issues. *See Sharp v. International Business Machines Corp.*, 927 S.W.2d 790, 795 (Tex.App.-Austin 1996, writ denied) (allowing relaxation of strict procedural requirements in the interests of judicial efficiency). We there-

fore conclude that it was not an abuse of discretion for the trial court to enter its findings of fact and conclusions of law without hearing additional evidence, and we accordingly overrule this issue on appeal.

## Class Certification

We now turn to F & G's primary contention on appeal: whether the trial court erred in granting the order to certify the consumer class.

■ Our review of an interlocutory appeal from a class certification order is limited to determining whether the trial court's order constituted an abuse of discretion. *Ford Motor Co. v. Ocanas*, 138 S.W.3d 447, 451 (Tex.App.-Corpus Christi 2004, no pet.); *see also Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 690–91 (Tex. 2002). Although we discuss the propriety of the class certification in light of the claims asserted by the named plaintiffs (i.e., misrepresentation of the design of the Maximus annuities), we are in no way evaluating the merits of these claims. *See Intratex Gas Co. v. Beeson*, 22 S.W.3d 398, 404 (Tex.2000) ("Deciding the merits of the suit in order to determine its maintainability as a class action is not appropriate.").

■ Typically under this standard of review, the appellate court must indulge every presumption favorable to the trial court's ruling. *See Graebel/Houston Movers, Inc. v. Chastain*, 26 S.W.3d 24, 29 (Tex.App.-Houston [1st Dist.] 2000, pet dism'd w.o.j.). On certification issues, however, the appellate court is not bound by this presumption and must independently determine whether the requirements of rule 42 have been fully satisfied. *See Ford Motor Co.*, 138 S.W.3d at 451; *see also Henry Schein*, 102 S.W.3d at 691; *Bernal*, 22 S.W.3d at 435 (determining that actual compliance with rule 42 "must be demonstrated; it cannot be presumed").

Under rule 42(a), every class action must satisfy four threshold requirements: numerosity, commonality, typicality, and adequacy of representation. *See* Tex.R. Civ. P. 42(a). Then, in addition to satisfying these four requirements, the class certification must also satisfy at least one of the subparts of rule 42(b). *See* Tex.R. Civ. P. 42(b). In their motion for class certification, appellees alleged that their motion for class certification was maintainable pursuant to rule 42(b)(3), which permits class actions when common questions of law or fact predominate and a class action is superior to other forms of adjudication. *See id.*

■ F & G contests the adequacy of the class's compliance with the 42(b)(3) requirement of predominance and superiority. We first consider the predominance requirement because it is one of the most stringent prerequisites to class certification. *See Ford Motor Co.*, 138 S.W.3d at 452. In evaluating whether common issues predominate, courts must identify the controlling substantive issues of the case and assess which issues will predominate to determine whether those issues are in fact common to the class. *Snyder Communications, L.P. v. Magana*, 142 S.W.3d 295, 300–01 (Tex.2004). Courts must therefore determine whether common or individual issues will be the object of most of the efforts of the litigants and the court. *Id.* at 301. If there are some common questions of law or fact, but the focus of the litigation will be mainly on individual issues, the court cannot certify the class under rule 42(b)(3). *Id.* We therefore must identify the major issues which will be the focus of the litigation.

■ Under the Deceptive Trade Practices Act in Texas, a consumer may maintain an action for economic damages or damages for mental anguish against a

party who has used or employed a false, misleading or deceptive act or practice relied on by a consumer to the consumer's detriment. *See* TEX. BUS. & COM.CODE ANN. § 17.50(a) (Vernon 2002). In California, a consumer may maintain an action under the Consumers Legal Remedies Act if the consumer suffered damages as a result of reliance upon another party's misrepresentation regarding the quality or characteristics of goods or products. *See* CAL. CIV.CODE § 1770 (Deering 2005); *see also Wilens v. TD Waterhouse Group, Inc.*, 15 Cal.Rptr.3d 271, 120 Cal.App.4th 746, 755 (Cal.App.2003). Establishing liability in both these states under the consumer protection laws requires that there be a finding that the consumer relied on the misrepresentation. An overwhelming majority of the class membership hails from these two states (88%), indicating that reliance will be a major focus of the litigation. Accordingly, this Court must determine if reliance will be a common and predominant issue, justifying class certification, or an individual issue. *See Snyder Communications*, 142 S.W.3d at 301. It is particularly difficult to establish commonality and predominance of reliance in a group setting because, as one court noted:

> Reliance is a thought process or one step in a larger thought process; ... [it] can be shown only by demonstrating the person's thought processes in reaching the decision. Proof of reliance or lack of reliance necessarily requires an *individualized* determination because, under all the same facts and circumstances, one person may have relied on the misrepresentation in reaching a decision while another did not rely on it in reaching the same decision.

*Grant Thornton, L.L.P. v. Suntrust Bank*, 133 S.W.3d 342, 355 (Tex.App.-Dallas 2004, pet. filed) (emphasis added).

In the *Henry Schein* opinion, the Texas Supreme Court severely limited the ability of potential plaintiffs to form a class when the issue of reliance is of importance to the resolution of the class claim. According to the holding in *Henry Schein*, reliance upon misrepresentations made to consumers must be proved with class-wide proof; class-wide proof requires the existence of class-wide evidence. *See Schein*, 102 S.W.3d at 693. Class-wide evidence requires that there be no differences in how individual members of the class relied on the misrepresentation. *Id.* at 693 ("Inescapably individual differences cannot be concealed in a throng."). The court did not entirely preclude class actions in which reliance was an issue, but it did make such cases a near-impossibility:

> If a plaintiff could prove reliance in an individual action with the same evidence offered to show class-wide reliance, then the issue is one of law and fact common to the class. The question the court must decide before certifying a class, after rigorous analysis and not merely a lick and a prayer, is whether the plaintiffs have demonstrated that they can meet their burden of proof in such a way that common issues predominate over individual ones.

*Id.* at 694. Under this standard, it is not enough to demonstrate that a defendant wanted purchasers to rely on its misrepresentations in choosing or staying with a particular product; instead there must be evidence that the purchasers actually did rely on the misrepresentations "so uniformly that common issues of reliance predominate over individual issues." *Id.* In the case of *Henry Schein*, there was "significant evidence that purchasers relied on recommendations from colleagues and others rather than any statements made directly or indirectly by [the defendant]." *Id.*

The *Henry Schein* test for class-wide reliance was applied by this Court in the *Ford Motor Co.* opinion, in which the named plaintiffs attempted to certify a class of all consumers who had purchased F–150 trucks with a Class III towing package. *Ford Motor Co.*, 138 S.W.3d at 450. The Class III package was advertised as including a special, larger radiator but actually was sold with only the base radiator. *Id.* The trial court certified a class consisting of all purchasers of the F–150 with the Class III towing package; however, relying on *Henry Schein*, we reversed and remanded the certification order because there was no evidence presented showing that all purchasers actually relied uniformly on Ford's promise of a larger radiator in making their purchase. *Id.* at 453. Despite the fact that the misrepresentation clearly occurred and the purchases were then made by all class members, the class also had to show that every purchaser relied on the misrepresentation in making the purchase. *Id.*

In the current case before us, the three named plaintiffs all provided deposition testimony regarding their reasons for purchasing the Maximus annuity. Rebecca Pina, when questioned as to her reasons for purchasing the Maximus annuity, replied "Because I liked the 7.2 [percent interest rate]. When I saw that number, I said, it's earning pretty good interest." Rosa Cortez, when asked the same question, said "Well, it was the interest rate, the 7.25 that caught my eye. I purchased it." When questioned further on what she would have done if she had realized at the time that the introductory interest rate would only apply to new money, Ms. Cortez answered, "I don't know what I would have done back then." Francisca Morales was asked by counsel: "The representation made to you that you were going to get 7.25 percent was what you relied on in deciding to buy the product, correct?"

She replied "Correct." During the same deposition, however, Ms. Morales noted that had the interest rate been 6 percent instead of 7.25, that rate "was just as good as 7, in my opinion." Although all of the named plaintiffs noted that the new money interest rate presented to them was the reason they initially invested in the Maximus annuity, none of them specifically stated that they actually relied on the interest rate to both remain constant and apply to all monies deposited.

Here, the named plaintiffs provided some evidence that they all relied on the new money interest rate when making their purchases. Each individual's reliance, however, was highly personalized; two of the plaintiffs indicated that the interest rate could have been different or temporary and this may not have affected their purchase. Furthermore, there was no evidence demonstrating class-wide uniform reliance by all purchasers. The trial court's findings of fact and conclusions of law noted that "there was class-wide evidence that Class members purchased annuities primarily due to the initial interest rate;" however, there was no discussion of what that class-wide evidence may have been, and appellees do not direct us to any such evidence in the record. Instead, appellees re-direct us to the above-mentioned testimony of the three named plaintiffs, each of which display differences and do not indicate how or whether other members of the class may have weighed the importance of the new money interest rate in making their investment decision. Indeed, it is difficult to imagine what could possibly qualify in this case as class-wide evidence of reliance on F & G's misrepresentations. Furthermore, we question whether there is any way, given the individualized nature of reliance, that a Deceptive Trade Practices Act-based claim premised on misrepresentation could ever

be certifiable as a class action under the rule enunciated in *Henry Schein.* Although *Henry Schein* appears to hold open the possibility, there is yet to be a case that has reached the courts of appeals in Texas since the *Henry Schein* opinion that has encountered a situation in which class-wide proof of reliance could be found.

## Conclusion

We do not say that "no class can be certified in this case; that matter must be decided by the trial court in the first instance." *Henry Schein,* 102 S.W.3d at 701; *Ford Motor Co.,* 138 S.W.3d at 454. We limit our conclusion to holding only that appellees failed to show that individualized determinations of reliance would not predominate over common questions of law or fact. *Ford Motor Co.,* 138 S.W.3d at 454.

Given our holding on this issue, we decline to address appellant's remaining issues on appeal. *See* Tex.R.App. P. 47.1. We reverse the judgment of the trial court and remand for further proceedings.