NUMBER 13-06-048-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


EXXON MOBIL CORPORATION, Appellant,


v.


DAN GILL, INDIVIDUALLY, AND AS

SUCCESSOR IN INTEREST TO DAN GILL,

INC., D/B/A DAN GILL EXXON, PATRICK T.

MORROW, INDIVIDUALLY, AND AS 

SUCCESSOR IN INTEREST TO CARROLLTON 

EXXON, F/D/B/A CARROLLTON EXXON, 

JOSEY LANE PETROLEUM, INC., D/B/A 

CARROLLTON EXXON, Appellees.

 


On appeal from the County Court at Law No. 4 


of Nueces County, Texas.

 

 

O P I N I O N



Before Justices Yañez, Rodriguez, and Garza


Opinion by Justice Garza
 


 Exxon Mobil Corporation ("Exxon") has filed this interlocutory appeal from the trial
court's order certifying a statewide class of plaintiffs in a breach of contract action for
money damages. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(3) (Vernon Supp.
2006) (allowing interlocutory appeal of class certification orders); Tex. R. Civ. P. 42(b)(3)
(providing for certification of class based on predominance of common questions). We
affirm the order. 

I. Background (1)

 This case was brought in 2003 by three current and former Exxon service-station
dealers--Dan Gill, Howard Granby, and Patrick Morrow--who had participated in certain
Exxon rebate programs in the 1990s. Exxon's rebate programs took two basic forms: 
ones that were volume-based (how much gasoline a dealer sold), and others based on
how a dealer operated and maintained his station (for example, keeping a station open
24-hours-a-day). Exxon's volume-based programs included "RASPP" (Retail Auto Store
Performance Program), "VIP" (Volume Incentive Program) and "SVIP" (Supreme Volume
Incentive Program). A dealer could qualify for rebates under these programs if the dealer's
sales surpassed a preset threshold. Exxon set the volume threshold requirements
individually based on each dealer's own "historical volume, competitiveness, image,
service, appearance, merchandising, promotional activity, and hours of operation." Under
the "Hours of Operation" rebate program, Exxon paid dealers rebates for staying open 24
hours a day, while other dealers received smaller rebates when operating fewer hours. 

 Notably, each dealer's standardized sales contract with Exxon has an "open price"
term, which allows Exxon to change its per-gallon sales prices "on a near-constant, often
daily basis" in response to the "intensity of retail competition." The price charged to dealers
under the contracts is known as the "DTT price" (dealer tank truck price). 

 In this lawsuit, the named plaintiffs complain that Exxon cheated them out of the
economic benefit of the rebates by adding the average per-gallon cost of the rebate
programs to the DTT price of gasoline. They have sued Exxon for three causes of action
related to the rebate programs: breach of contract regarding the DTT prices charged under
their sales agreements, breach of the duty of good faith and fair dealing, and breach of the
promise to provide economic benefits under the rebate programs. 

 On motion of the named plaintiffs, the trial court certified a class consisting of "all
persons, partnerships, corporations, associations and entities which are and/or were at the
material times Exxon-branded retail service station dealers who owned or operated Exxon
branded retail motor fuel stores in the state of Texas and who entered into a standardized
contract or agreement with ExxonMobil . . . [, with] material times [meaning] the period
during which the rebate programs . . . were in effect in Texas."

 In a 34-page order certifying the statewide class, which we have attached as an
appendix to this opinion, the trial court recounted the proceedings leading to the
certification order and gave both a summary of the case and an overview of the evidence,
arguments, motions, and briefs presented and discussed during the certification hearing. 
See Class Certification Order, appendix. The court's order also provides a lengthy
evaluation of how the named plaintiffs have met the requirements for class certification
under Rule 42(a) and (b)(3). See Tex. R. Civ. P. 42(a), (b)(3). The order includes findings
of fact and conclusions of law on the specific requirements for class certification. In
addition, the order discusses Exxon's objections to class certification and explains the trial
court's grounds for overruling the objections. The order includes a seven-page trial plan,
which outlines a proposal for trying both the class's claims against Exxon and Exxon's
defenses to the claims. 

II. Class Certification under Rule 42

 Texas Rule of Civil Procedure 42 governs class certification. Tex. R. Civ. P. 42. 
Rule 42 is patterned after Federal Rule of Civil Procedure 23, and federal decisions and
authorities interpreting current federal class action requirements are persuasive authority
for Texas courts. Southwestern Ref. Co. v. Bernal, 22 S.W.3d 425, 433 (Tex. 2000) (citing
RSR Corp. v. Hayes, 673 S.W.2d 928, 931-32 (Tex. App.--Dallas 1984, writ dism'd)). All
class actions must satisfy four threshold requirements: (1) numerosity ("the class is so
numerous that joinder of all members is impracticable"); (2) commonality ("there are
questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the
representative parties are typical of the claims or defenses of the class"); and (4) adequacy
of representation ("the representative parties will fairly and adequately protect the interests
of the class"). Id. (quoting Tex. R. Civ. P. 42(a)). In addition to these prerequisites, class
actions must satisfy at least one of the three subdivisions of Rule 42(b). Id. (citing Tex. R.
Civ. P. 42(b)).

III. Standard of Review

 We review class certification orders for abuse of discretion. Henry Schein v.
Stromboe, 102 S.W.3d 675, 691 (Tex. 2003) (citing Bernal, 22 S.W.3d at 439). (2) Actual,
demonstrated compliance with Rule 42 is required for certification. Id. The trial court must
perform a rigorous analysis and provide a specific explanation for how class claims will
proceed to trial. Id. at 689 (citing Bernal, 22 S.W.3d at 439). A trial plan is required in
every class certification order "to allow reviewing courts to assure that all requirements for
certification under Rule 42 have been satisfied." BMG Direct Mktg. v. Peake, 178 S.W.3d
763, 778 (Tex. 2005); State Farm Mut. Auto. Ins. Co. v. Lopez, 156 S.W.3d 550, 555 (Tex.
2004). To make a proper analysis, "going beyond the pleadings is necessary, as a court
must understand the claims, defenses, relevant facts, and applicable substantive law in
order to make a meaningful determination of the certification issues." Bernal, 22 S.W.3d
at 435. Although it may not be an abuse of discretion to certify a class that could later fail,
a cautious approach to class certification is essential. Id. We cannot indulge every
presumption in favor of the trial court's ruling on class certification. See Henry Schein, 102
S.W.3d at 691. Instead, we review the certification order for "actual, demonstrated
compliance," giving deference, where appropriate, to the trial court's resolution of certain
limited issues, such as determinations based on the "assessment of the credibility of
witnesses." See id. 

IV. Analysis

 The trial court certified the class based on Rule 42(b)(3), which requires that
"questions of law or fact common to the class . . . predominate over any questions affecting
only individual members" and that class treatment be "superior to other available methods
for the fair and efficient adjudication of the controversy." Tex. R. Civ. P. 42(b)(3). Exxon
now raises challenges to each of the requirements for class certification, with the exception
of numerosity. See Tex. R. Civ. P. 42(a), (b)(3). 

 Exxon complains that "the trial court . . . misinterpreted the underlying law . . . ." 
See, e.g., Appellant's Brief, p. 34. Although the trial court certified a class of plaintiffs
with contract claims, many of Exxon's arguments characterize the order as having certified
a class of fraud plaintiffs. Exxon emphasizes how difficult it will be for the class
representatives to produce class-wide proof that each class member individually and
reasonably "relied" on a false representation by Exxon. See Ernst & Young, L.L.P. v. Pac.
Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001) (stating that fraud claimant must "show
that it actually and justifiably relied on the representation and thereby suffered injury");
Trenholm v. Ratcliff, 646 S.W.2d 927, 930 (Tex. 1983) (same). 

 Because Exxon has raised pervasive complaints regarding the trial court's
interpretation and application of controlling substantive law, we begin our analysis with an
overview of the legal causes of action certified in this case and the controlling law. 
Although we are not to resolve the merits of the claims in our analysis, the Texas Supreme
Court has explained that "issues [such] as commonality, typicality, superiority, and
predominance are at least tangentially related to the merits; i.e., one cannot know whether
a representative's claim is 'typical' of those of the class without knowing something about
the merits." In re Alford Chevrolet-Geo, 997 S.W.2d 173, 182 (Tex. 1999). Thus,
"substantive law . . . must be taken into consideration in determining whether the purported
class can meet the certification prerequisites under Rule 42." Union Pac. Res. Group, Inc.
v. Hankins, 111 S.W.3d 69, 72-73 (Tex. 2003). 

 In the statement of facts provided in Exxon's appellate brief, the company states
that the plaintiffs "base their claims on alleged oral promises and Exxon's supposed
'secrecy' in including costs from its rebate programs in its prices." Appellant's Brief, p.
1. The brief continues, "Although they do not formally assert any claims for fraud, all three
of their claims depend on allegations of secrecy, misrepresentation and concealment, just
as in a typical fraud case." Id. at 8. Exxon then asserts that "fraud cases never pass
muster under Rule 42." Id. at 12. And it suggests that "the complaint about secret
wrongdoing confirms that this case is an effort to certify a fraud class by another name .
. . ." Id. at 14. According to Exxon, "This 'secret catch-back' class is just a fraud class in
contract clothing." Id. at 24. "The whole notion of a 'secret catch-back' is simply a
backdoor effort to create a fraud class that everyone knows would not survive appellate
review if it were labeled that way." Id. at 28.

 Fraud requires proof of actual and justifiable reliance, proof which is necessarily of
an "individualized" nature. Fid. & Guar. Life Ins. Co. v. Pina, 165 S.W.3d 416, 423 (Tex.
App.--Corpus Christi 2005, no pet.). As we recently noted in Pina, an opinion reversing
the certification of a class of fraud plaintiffs, "It is particularly difficult to establish
commonality and predominance of reliance in a group setting because . . . 'under all the
same facts and circumstances, one person may have relied on the misrepresentation in
reaching a decision while another did not rely on it in reaching the same decision.'" Id.
(quoting Grant Thornton, L.L.P. v. Suntrust Bank, 133 S.W.3d 342, 355 (Tex. App.--Dallas
2004, pet. filed)). 

 Because of the foregoing arguments, which are disputed by the named plaintiffs,
we begin with what the Texas Supreme Court has described as the "often . . . difficult"
determination of what type of action has been certified. See Jim Walter Homes, Inc. v.
Reed, 711 S.W.2d 617, 617 (Tex. 1986). "We must look to the substance of the cause of
action and not necessarily the manner in which it was pleaded." Id. at 617-18 (citing Int'l
Printing Pressmen and Ass't Union v. Smith, 198 S.W.2d 729 (1946)). "The contractual
relationship of the parties may create duties under both contract and tort law." Id. at 618
(citing Montgomery Ward & Co. v. Scharrenbeck, 204 S.W.2d 508 (1947)). "The acts of a
party may breach duties in tort or contract alone or simultaneously in both." Id. "The
nature of the injury most often determines which duty or duties are breached." Id. "When
the injury is only the economic loss to the subject of a contract itself, the action sounds in
contract alone." Id. (citing Mid-Continent Aircraft Corp. v. Curry County Spraying Serv.,
572 S.W.2d 308, 312 (Tex. 1978); Nobility Homes of Tex., Inc. v. Shivers, 557 S.W.2d 77
(Tex. 1977)).

 The trial court's order states that it certified the following three claims: (1) breach
of the sales agreement; (2) breach of the UCC duty of good faith; and (3) breach of the
rebate promises. See Class Certification Order, pp. 5, 27. The injuries alleged by the
named plaintiffs (3)
 and described in the trial court's certification order are economic losses
to the class members' contracts with Exxon. See id. at 2 ("The plaintiffs allege that instead
of giving its dealers the promised economic benefit, Exxon made the dealers as a group
pay for the costs of the programs by adding the full costs of the rebate as a secret charge
on top of the ordinary 'DTT' wholesale gasoline price."). The claims are therefore contract
claims, not tort claims, as Exxon suggests. See id. at 10 ("This case is pled as a contract
case."). 

A. Numerosity

 The first requirement for certification is that "[t]he class is so numerous that joinder
of all members is impracticable." Tex. R. Civ. P. 42(a)(1). The trial court's certification
order states that "there are hundreds of potential class members." Class Certification
Order, p. 3. The order also states that Exxon has conceded that the numerosity
requirement is satisfied in this case. Id. Exxon has not challenged numerosity on appeal. 
Accordingly, with no further discussion, we conclude that there was no abuse of discretion
in the trial court's certification of the class as it relates to numerosity. See Tex. R. App. P.
47.1. 

B. Commonality & Predominance

 The second requirement for certification is that "[t]here are questions of law, or fact
common to the class." Tex. R. Civ. P. 42(a)(2). "The threshold for commonality is not
high." Union Pac. Res. Group, Inc. v. Hankins, 111 S.W.3d 69, 74 (Tex. 2003). "Yet it
does require at least one issue of law or fact that inheres in the complaints of all class
members." Id. A common issue must also be "applicable to the class as a whole" and
"subject to generalized proof." Id. (quoting Nichols v. Mobile Bd. of Realtors, Inc., 675 F.2d
671, 676 (5th Cir. 1982)).

 Exxon argues that there is no commonality in this case. It contends that the named
plaintiffs and the trial court failed to identify even a single issue that meets Rule 42(a)'s
"flexible" commonality requirement. Bernal, 22 S.W.3d at 435 (describing the test for
commonality as "flexible"). According to Exxon, there is not even one issue in this case
that would be "applicable to the class as a whole" and "subject to generalized proof." See
Hankins, 111 S.W.3d at 74. 

 Exxon has addressed the plaintiffs' claims as being either fraud claims or claims for
breach of an open price term under section 2.305(b) of Texas Business and Commerce
Code. See Tex. Bus. & Com. Code Ann. § 2.305(b) (Vernon 1994). We have already
explained that the plaintiffs have not asserted a cause of action for fraud. In the analysis
below, we address the three claims actually certified by the trial court: (1) breach of the
sales agreement; (2) breach of the UCC duty of good faith; and (3) breach of the rebate
promises. See Class Certification Order, pp. 5, 27.

1. Commonality

 The trial court's certification order identifies the following issues of law and fact
common to the class:

(1) Whether Exxon's Sales Agreements with their open-price terms
precluded Exxon from adding its costs from its rebate programs to its
wholesale gasoline DTT price;


(2) Whether the standard-form invoices and rebate documents that Exxon
sent or had its managers show to its dealers disclosed that Exxon was
adding the cost of the rebate programs to the DTT price; 


(3) Whether Exxon did in fact systematically add its average market-area
rebate costs to its DTT price in each market area;


(4) Whether Exxon's adding of its rebate costs to its DTT price is an act of
dishonesty that takes this case out of the "normal case" under UCC § 2-305;


(5) Whether Exxon's including rebate costs in its DTT price breached its
duty of good faith under UCC § 2-305; and 


(6) How much Exxon added to its DTT price to recoup its rebate costs. 


Id. at 3-4. 


 In challenging the commonality requirement, Exxon argues that the trial court erred
in failing to apply the leading case on open-price contracts, Shell Oil Co. v. HRN, 144
S.W.3d 429 (Tex. 2004). Specifically, Exxon argues:

The essence of the supreme court decision [in HRN] was to adopt a
bright-line standard for open price complaints under the UCC. A seller's
open price will survive scrutiny under the UCC so long as the price has two
characteristics: (1) it is commercially reasonable, i.e., within the range of
prices charged by others in the market, and (2) it is not being used to price
discriminate among the buyers. 


* * * 


Plaintiffs premise their case on an allegation that Exxon acted in bad faith by
incorporating the cost of its rebate programs into the price it charged dealers. 
But they did not allege or prove that Exxon charged prices outside the range
of its competitors or discriminated against similarly situated dealers. That is
not a claim that can survive under Texas law. 


Appellant's Brief, pp. 34-35 (internal citations omitted). 

 We address this argument in two parts. The first part of the argument is that two
of the three causes of action certified by the trial court, specifically, those for breach of the
sales agreement and breach of the UCC duty of good faith, are actually the same cause
of action. That is, they amount to a single cause of action for breach of the open price
terms in the sales agreements, which were supposed to be set in "good faith" under the
UCC. See Tex. Bus. & Com. Code Ann. § 2.305. The second part of the argument is that
HRN precludes the named plaintiffs' cause of action for breach of the open price term. As
explained below, we agree with the first part of Exxon's argument, but we disagree with the
second part. 

a. Open Price Terms in Sales Contracts & The Duty of Good Faith under Section
2.305(b)

 As the Texas Supreme Court has explained, "Most contracts for the sale of goods
specify a price, but some do not because either the parties fail to consider the issue
directly or purposefully leave it for later determination." HRN, 144 S.W.3d at 432. "When
a contract for the sale of goods does not specify a price, section 2.305 of the Uniform
Commercial Code supplies default rules for determining whether a contract exists and what
the price should be." Id. (citing Tex. Bus. & Com. Code Ann. § 2.305). "This section is one
of a series of provisions in Article 2 of the Code that fill common 'gaps' in commercial
contracts." Id. 

 The section of the Code dealing with open-price-term contracts is codified as section
2.305 of Texas Business and Commerce Code and provides:

(a) The parties if they so intend can conclude a contract for sale even though
the price is not settled. In such a case the price is a reasonable price at the
time for delivery if


 (1) nothing is said as to price; or


 (2) the price is left to be agreed by the parties and they fail to agree;
or


 (3) the price is to be fixed in terms of some agreed market or other
standard as set or recorded by a third person or agency and it is not
so set or recorded.


(b) A price to be fixed by the seller or by the buyer means a price for him to
fix in good faith.


(c) When a price left to be fixed otherwise than by agreement of the parties
fails to be fixed through fault of one party the other may at his option treat the
contract as cancelled or himself fix a reasonable price.


(d) Where, however, the parties intend not to be bound unless the price be
fixed or agreed and it is not fixed or agreed there is no contract. In such a
case the buyer must return any goods already received or if unable so to do
must pay their reasonable value at the time of delivery and the seller must
return any portion of the price paid on account.


Tex. Bus. & Com. Code Ann. § 2.305.

 In this case, the parties agree that the Code imposes on Exxon the obligation of
good faith when fixing its DTT price under the sales agreements, providing that "[a] price
to be fixed by the seller or by the buyer means a price for him to fix in good faith." Id. §
2.305(b). In discussing issues common to the class, the trial court's order identifies the
open-price-term provision in section 2.305(b) as controlling the issue of whether Exxon
breached its sales agreements. See Class Certification Order, pp.3-4, 8-9, 11, 27. The
order also identifies good faith under section 2.305(b) as the controlling legal standard for
whether Exxon breached its duty of good faith under the UCC. See id. The named
plaintiffs have also treated the two causes of action as being the same. Brief of
Appellees, p.1 ("All Texas dealers had Sales Agreements with open DTT prices, all subject
to the UCC duty of good faith."). On this record, we agree that the two causes of action
are the same for purposes of class certification. We will therefore refer to the claims
together as simply the "section 2.305(b)" claims. 

b. HRN

 The second part of Exxon's argument is that HRN precludes a section 2.305(b)
claim based on the facts alleged by the named plaintiffs. In HRN, the Texas Supreme
Court warned that "[p]remising a breach of contract claim solely on assumed subjective
motives injects uncertainty into the law of contracts and undermines one of the UCC's
primary goals - to 'promote certainty and predictability in commercial transactions.'" HRN,
144 S.W.3d at 435 (quoting Am. Airlines Employees Fed. Credit Union v. Martin, 29
S.W.3d 86, 92 (Tex. 2000)). The effect of HRN was "to eliminate litigation over prices that
are nondiscriminatory and set in accordance with industry standards." Id. 

 HRN did not eliminate section 2.305(b) claims based on "allegation[s] of bad faith
[that] result in a commercial injury distinct from the price increase itself." Id. at 436. It
cautioned, "Allegations of dishonesty under . . . section [2.305] must also have some basis
in objective fact which at a minimum requires some connection to the commercial realities
of the case." Id. at 435-36. In reaching its holding, the Texas Supreme Court specifically
relied on Official Comment 3 to section 2.305, which explains:

3. Subsection [b], dealing with the situation where the price is to be fixed
by one party rejects the uncommercial idea that an agreement that the seller
may fix the price means that he may fix any price he may wish by the
express qualification that the price so fixed must be fixed in good faith. Good
faith includes observance of reasonable commercial standards of fair dealing
in the trade if the party is a merchant. (Section 2-103). But in the normal case
a "posted price" or a future seller's or buyer's "given price," "price in effect,"
"market price," or the like satisfies the good faith requirement.


See id. (quoting Tex. Bus. & Com. Code Ann.§ 2.305 cmt. 3) (emphasis added)).

 The fourth and fifth "common issues" identified in the trial court's order are "whether
Exxon's adding of its rebate costs to its DTT price is an act of dishonesty that takes this
case out of the 'normal case' under UCC § 2-305" and "whether Exxon's including rebate
costs in its DTT price breached its duty of good faith under UCC § 2-305." Class
Certification Order, pp. 3-4. In our view, these issues are appropriate for the section
2.305(b) claims pled against Exxon. They are also consistent with HRN.

 Under HRN, the controlling question for the section 2.305(b) claims is whether the
"allegations of dishonesty" in this case have "some objective basis in fact," meaning "a
commercial injury distinct from the price increase itself." HRN, 144 S.W.3d at 435-36. If
so, this would not be the "normal case" described in Comment 3, where the seller's "'given
price,' 'price in effect,' 'market price,' or the like satisfies the good faith requirement." Tex.
Bus. & Com. Code Ann.§ 2.305 cmt. 3. Comment 3 "rejects the uncommercial idea that
an agreement that the seller may fix the price means that he may fix any price he may
wish." Id. 

 Unlike HRN, this case involves more than an open price term that was allegedly
determined based on a "subjectively improper motive." See HRN, 144 S.W.3d at 432. In
this case, there were contemporaneously performed standardized sales contracts and
various rebate-incentive programs that were implemented and ceased at specific points
in time, involving specific promises of economic remuneration for keeping stores open
specified hours and selling specified volumes of gasoline. The legal reality of this case is
that the plaintiffs have sued for more than breach of the open-price term under the
standardized sales agreements. They have also sued for breach of the promise to provide
economic benefits under the rebate programs. Thus, we share the trial court's conclusion
that a "common issue" will be whether Comment 3 and HRN preclude or allow recovery
based on the class's allegations of dishonesty and a commercially distinct injury based on
the economic loss of the rebates. See Class Certification Order, p.11 ("Whether
Exxon's alleged conduct in secretly catching-back the rebates in the price of the gasoline
it sold to the class members was in bad faith will involve a determination under § 2.305 of
whether the circumstances here constitute a 'normal' case . . . [under] Comment 3."). 

c. Common Proof & Common Answers

 Exxon has also attempted to defeat certification on the basis that there can be no
"common proof" or "common answers," as required by the Texas Supreme Court in
Hankins. See Hankins, 111 S.W.3d at 75. Exxon frames the controlling legal questions
in this case in terms of each individual dealer's subjective knowledge and intent. It does
this in two ways. First, it suggests that a dealer's lack of knowledge of the catch-backs is
a prerequisite to recovery on their claims, thus defeating the possibility of "common proof." 
See Appellant's Brief, p. 27 (stating "their burden as a class representative is to prove
that no dealer, not a single dealer could know, understand, or believe"). And second,
Exxon suggests that a dealer's knowledge of the catch-backs is a defense for Exxon, thus
necessitating an opportunity for Exxon to prove that different dealers knew different things,
and again defeating class treatment of the claims because there would be no "common
proof" or "common answers." See id. at 29 (complaining that "[w]hat the trial court did not
do was to confront the evidence of differences among different dealers as to their
understanding of the rebate programs."). 

 We first address Exxon's argument that varying levels of individual dealer
knowledge defeat "common proof" for the class claims against Exxon. As the trial court
noted, this is a contract case. See Class Certification Order, p. 10. To recover for
breach of contract, a claimant must prove the following: (1) there is a valid, enforceable
contract; (2) the claimant performed as required under the contract; (3) the defendant has
breached the contract; and (4) the defendant's breach caused the claimant injury. Valero
Mktg. & Supply Co. v. Kalama, Int'l, 51 S.W.3d 345, 351 (Tex. App.--Houston [1st Dist.]
2001, no pet.). 

 There is no dispute that valid, enforceable sales and rebate agreements exist
between Exxon and the putative class members. See Class Certification Order, pp. 10,
12. There is also no dispute that the material terms of the contracts are the same or
similar throughout the class. See id. The trial court's order states that the terms of the
sales agreements "are uniform in the most material respect" and that the "rebate programs
had uniform terms." Id. at 10 (sales agreement), 12 (rebate programs). 

 The parties' dispute over liability concerns two central questions common to the
class: (1) whether Exxon actually recouped the average per-gallon cost of the rebate
programs by adding it to the DTT price; and (2) whether such conduct amounted to a
breach of contract either under the sales agreements and section 2.305(b) or under the
rebate programs. 

 "Exxon denies that it ever 'recouped' the 'full cost' of the rebate programs in its DTT
price." Appellant's Brief, p. 31. According to Exxon, "The cost of the rebate programs
did not drive Exxon's pricing decisions. Nor did Exxon use a rigid formula aimed at
'recouping' any rebate costs in the DTT price charged dealers. Exxon simply considered
the cost of the rebates as one factor in its ongoing review of the competitive market." Id.
at 4, 31 n.4.

 Thus, a contested liability issue common to the class will be whether Exxon actually
recouped the average per-gallon cost of the rebate programs by adding it to the DTT price,
as alleged by the named plaintiffs. The trial court's order states that the named plaintiffs
will seek to prove this contested liability question using class-wide proof of Exxon's
standardized practice of systematically recouping the costs of the rebate programs and
thus the economic value conferred to the dealers through "credits" on their sales invoices. 
See Class Certification Order, pp. 10-20. The certification order identifies different
types of class-wide evidence offered by the named plaintiffs to prove these allegations. 
See id. (discussing various types of class-wide evidence). The order also notes Exxon's
denial that it has "recouped" the "full cost" of the rebate programs in its DTT price. See id.
at 16 ("Earlier in this case, it did not seem that Exxon would deny that it on average
recouped the rebate cost in its DTT price . . . . Some of Exxon's evidence suggests that
it may now dispute whether it actually recouped full rebate costs 'on average' in its DTT
price."); Appellant's Brief, p.31 (denying that Exxon ever "recouped" the "full cost" of the
rebate programs in its DTT price). 

 Whether Exxon did or did not recoup the full cost of the rebate programs is a
hotly-contested fact issue in the case. Given Exxon's position that it did not fully recoup
the rebates, it is unclear how or why resolution of this dispute depends on individual dealer
knowledge or understanding, as Exxon suggests. (4) The trial court's order notes that Exxon
will most likely use class-wide evidence to prove that it never "recouped" the "full cost" of
the rebate programs in its DTT price. See Class Certification Order, p.16. Thus, there
will be common proof for both the class members and for Exxon on one of the most
hotly-contested fact issues at trial. 

 Another hotly-contested fact issue is whether Exxon actually informed the dealers
about the relationship between DTT prices and the rebate programs. Exxon maintains that
it did, but claims that it did so in different ways, with different results. See Appellant's
Brief, p.30 ("Exxon presented extensive evidence that its dealers knew about the
relationship between its rebate programs and DTT prices in varying ways, and likely to
varying degrees."). The trial court ruled that common proof could nevertheless be used to
prove what Exxon did and did not disclose, noting that even Exxon had offered class-wide
proof of its disclosures. See Class Certification Order, p.14 ("Exxon says for purposes
of certification that what its dealers knew varies individually, but at the same time it argues
that it sent a uniform message to the dealers and points to classwide evidence on this
issue. Exxon claims that it told all of its dealers that it was 'offsetting' its rebate costs by
increasing its DTT prices.").

 The central issue in dispute is not whether Exxon told different dealers different
things. The central issue is whether Exxon recouped the "full value" of the rebates. Exxon
denies doing so. The named plaintiffs allege that it did. As a practical matter, if the named
plaintiffs succeed at trial in showing that Exxon fully recouped the value of the rebates, they
will have also established Exxon's dishonesty in the transactions and throughout this
litigation in maintaining (as it does in this appeal) that it never "recouped" the "full cost" of
the rebate programs in its DTT price. 

 Either Exxon is telling the truth about not fully-recouping the rebates, or it is not. 
The answer can be determined on a class-wide, "yes" or "no" basis, and the answer will be
the same for all members of the class based on the class-wide evidence identified in the
trial court's order. See Class Certification Order, pp. 10-20. If the named plaintiffs
prevail in establishing that Exxon's position is incorrect, they will have also established
Exxon's dishonesty on a class-wide basis. We think this is pretty close to an ideal
situation, where class treatment will involve class-wide evidence that has at least the
demonstrated potential to uniformly resolve hundreds of disputes about the same alleged
conduct by Exxon. 

 Whether Exxon's alleged misconduct (if proven) amounts to a breach of good faith
under section 2.305(b) or a breach of the rebate programs are issues that go to the merits
of the case. As such, they are properly reserved in the first instance to the jurisdiction of
the trial court. See Intratex Gas Co. v. Beeson, 22 S.W.3d 398, 404 (Tex. 2000) ("Deciding
the merits of the suit in order to determine the scope of the class or its maintainability as
a class action is not appropriate."). In this analysis, we address only whether common
proof can be used on the common issues regarding Exxon's conduct for purposes of
certification. We agree with the trial court's reasoning when it declared that "the controlling
issues can be proven with common evidence" because "the focus of the litigation is going
to be on Exxon's conduct." See Class Certification Order, p. 9. For these reasons, we
reject Exxon's argument that varying levels of individual dealer knowledge will defeat
common proof for the class. 

 As noted above, Exxon has also raised individual dealer knowledge of the
catch-back as a defense to the claims of the named plaintiffs, arguing that there will be "no
common proof" or "common answers" to the class claims. As a part of defensive issues
(rather than as part of the named plaintiffs' case-in-chief), we believe that individual dealer
knowledge is properly considered in reviewing the trial court's predominance ruling, rather
than its ruling on commonality. See Hankins, 111 S.W.3d at 74 (stating that commonality
requires only "one issue of law or fact that inheres in the complaints of all class members")
(emphasis added). Accordingly, we overrule Exxon's challenge to commonality and
proceed to address its challenge to predominance. 

2. Predominance

 The certification order identifies the following "controlling substantive issues" that
will predominate over individual issues:

(1) Whether Exxon and the class members entered into contracts with
materially, similar open-price terms;


(2) Whether Exxon created uniform rebate programs that promised dealers
that they would earn rebates if they sold certain amounts of gasoline;


(3) Whether Exxon used the same methodology to compute its gasoline
prices to dealers in Texas;


(4) Whether Exxon secretly added a rebate catch-back to the price of the
gasoline it sold to the class members;


(5) Whether Exxon's secret rebate catch-back was a breach of Exxon's duty
to price its gasoline to the dealers in good faith, and a breach of the
contracts with the class members; and 


(6) The aggregate amount of the rebate catch-back.


See Class Certification Order, p. 9. 

 "The predominance requirement is one of the most stringent prerequisites to class
certification." Bernal, 22 S.W.3d at 433. "In effect, the exacting standards of the
predominance inquiry act as a check on the flexible commonality test under Rule 42(a)(2)." 
Id. at 435. "The predominance requirement is intended to prevent class action litigation
when the sheer complexity and diversity of the individual issues would overwhelm or
confuse a jury or severely compromise a party's ability to present viable claims or
defenses." Id. at 434. To aid a court in determining if (b)(3) certification is appropriate, the
rule establishes a list of non-exhaustive factors to consider:

(A) the interest of members of the class in individually controlling the
prosecution or defense of separate actions; 


(B) the extent and nature of any litigation concerning the controversy already
commenced by or against members of the class; 


(C) the desirability or undesirability of concentrating the litigation in the
particular forum; and 


(D) the difficulties likely to be encountered in the management of a class
action.


Tex. R. Civ. P. 42(b)(3). 

 "Courts determine if common issues predominate by identifying the substantive
issues of the case that will control the outcome of the litigation, assessing which issues will
predominate, and determining if the predominating issues are, in fact, those common to
the class." Bernal, 22 S.W.3d at 434 (citing Reserve Life Ins. Co. v. Kirkland, 917 S.W.2d
836, 839 (Tex. App.--Houston [14th Dist.] 1996, no writ); Amoco Prod. Co. v. Hardy, 628
S.W.2d 813, 816 (Tex. App.--Corpus Christi 1981, writ dism'd)). "The test for
predominance is not whether common issues outnumber uncommon issues but, as one
court stated, 'whether common or individual issues will be the object of most of the efforts
of the litigants and the court.'" Id. (quoting Central Power & Light Co. v. City of San Juan,
962 S.W.2d 602, 610 (Tex. App.--Corpus Christi 1998, writ dism'd w.o.j.)). "If, after
common issues are resolved, presenting and resolving individual issues is likely to be an
overwhelming or unmanageable task for a single jury, then common issues do not
predominate." Id. Ideally, "a judgment in favor of the class members should decisively
settle the entire controversy, and all that should remain is for other members of the class
to file proof of their claim." Id. (quoting Life Ins. Co. of the Southwest v. Brister, 722
S.W.2d 764, 772 (Tex. App.--Fort Worth 1986, no writ)).

 The central liability questions inherent in the complaints of all class members are
whether Exxon breached its good faith obligation under its sales contracts and whether it
breached its rebate promises by systematically recouping the economic value of the
rebates through DTT pricing. Exxon contends that individual issues will predominate over
these common questions, citing as support several issues that "must be resolved on a
dealer-by-dealer basis." Appellant's Brief, p. 32. Chief among these issues "are
differences among dealers as to their understanding of the rebate programs." Id. at 29. 
Exxon also cites defenses that must be decided individually, such as release, notice, and
statute of limitations. Id. at 29-33. For the reasons that follow, we overrule Exxon's issues. 

a. Voluntary Payment Rule and Individual Dealer Knowledge

 Exxon relies on the voluntary payment rule to create an issue regarding individual
dealer knowledge, an issue which has already featured prominently in the arguments
addressed in this opinion. The trial court rejected the voluntary payment rule as a defense,
stating that it does not apply to claims for breach of contract. We agree. 

 Voluntary payment is a common law rule that has been articulated as follows: 
"'Money voluntarily paid on a claim of right, with full knowledge of all the facts, in the
absence of fraud, deception, duress, or compulsion, cannot be recovered back merely
because the party at the time of payment was ignorant of or mistook the law as to his
liability.'" BMG Direct, 178 S.W.3d at 768 (quoting Pennell v. United Ins. Co., 243 S.W.2d
572, 576 (Tex. 1951)). The rule is a defense to claims asserting unjust enrichment, not to
claims for breach of contract. Id. at 775. We therefore conclude that, in this action for
breach of contract, individual dealer knowledge of the catch-backs is not a valid defense
and cannot be characterized on that basis as a "substantive issue of the case" that will be
"the object of most of the efforts of the litigants and the court." Bernal, 22 S.W.3d at 434.

b. Balancing Issues Common to the Class with Individual Issues on Defenses of
Release, Notice, and Statute of Limitations

 Exxon's remaining defenses are release, notice, and statute of limitations. Again,
Exxon argues that these defenses raise questions that "cannot be answered the same way
for all dealers." Appellant's Brief, p. 33. It contends that the trial court erred in certifying
a class of plaintiffs to which these defenses will be asserted because the defenses will
depend on individual dealer knowledge and on facts of an individualized nature, thus
defeating the possibility of common proof. Id. at 29-33, 40-45. According to Exxon,
predominance is impossible because Exxon needs "to cross-examine each class member"
or be "stripped of any defenses." Id. at 45. We disagree. 

 Predominance is not a question of pure law on which we give no deference to the
trial court. The trial court's determination of predominance is reviewed for abuse of
discretion. Henry Schein, 102 S.W.3d at 691 (citing Bernal, 22 S.W.3d at 439). The
standard of review is not "de novo." See id. This is important because it is not necessarily
an abuse of discretion to certify a class that might ultimately fail. See Bernal, 22 S.W.3d
at 435 ("Although it may not be an abuse of discretion to certify a class that could later fail,
a cautious approach to class certification is essential."). 

 Exxon complains that the trial court abused its discretion by denying Exxon its due
process rights to assert defenses against individual class members. Exxon airs most of
its complaints about the trial court's ruling on predominance with the tacit understanding
(not shared by this Court) that individual dealer knowledge of the rebate catch-backs will
be paramount in this case. We have reviewed and rejected this contention in overruling
Exxon's challenge to commonality. 

 Our review of predominance is different, however, because we address Exxon's
defenses, including notice and limitations. The trial court discussed these defenses in its
predominance analysis. See Class Certification Order, pp. 32-33. The court noted that
the named plaintiffs have pled fraudulent concealment to avoid the defenses of notice and
limitations. Id. According to the certification order, none of the class members gave the
pre-suit notice required under the UCC. Id. at 33. The order also indicates the possibility
that the class claims will be assailable on limitations grounds. See id. In ruling that the
predominance requirement was satisfied, the trial court stated that the class allegations of
fraudulent concealment will determine whether the section 2.305(b) claims are defeated
by the pre-suit notice requirement under the UCC or by the statute of limitations. Id. We
agree. 

 "When a defendant has fraudulently concealed the facts forming the basis of the
plaintiff's claim, limitations does not begin to run until the claimant, using reasonable
diligence, discovered or should have discovered the injury." See KPMG Peat Marwick v.
Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 750 (Tex. 1999). The "essential
ingredients" of fraudulent concealment include, first, actual knowledge of the fact that a
wrong has occurred, and, second, a fixed purpose to conceal the wrong. Earle v. Ratliff,
998 S.W.2d 882, 888 (Tex. 1999). 

 Allegations of these "essential ingredients" are present in this case. They inhere in
the injuries alleged by the named plaintiffs. Exxon is alleged to have systematically and
secretly recouped the economic value of the rebates. The class-wide allegations of secret
injuries are relevant not only to the class claims of bad faith under section 2.305(b), but
also to the allegations of fraudulent concealment that will determine Exxon's notice and
limitations defenses. See Appellant's Brief, p. 45 ("[D]efenses that depend on each class
member's understanding of the relationship between the rebate programs and the pricing
. . . include the statute of limitations and the notice defenses mentioned earlier."). 

 Again, we disagree with Exxon's specific complaint about the significance of
individual dealer knowledge. We do not agree that it will be necessary for Exxon "to
cross-examine each class member," as it emphatically contends. See id. One of the most
hotly-disputed questions in this case is whether Exxon recouped the "full cost" of the rebate
programs without telling the class members. Even in this appeal, Exxon maintains that it
did not recoup the "full cost" of the programs. Exxon's position amounts to a class-wide
assertion that presents the same fundamental issue for each class member: specifically,
"whether Exxon secretly added a rebate catch-back to the price of the gasoline it sold to
the class members." See Class Certification Order, p. 9 (identifying the foregoing as
the fourth "controlling substantive issue in this case").

 Given Exxon's position before and during this litigation, "secretly added a rebate
catch-back to the price" would mean the "full" (rather than partial) cost of the rebates. 
Exxon admits to partially recouping the rebates and even that it told dealers about a partial
catch-back practice. But nowhere in the pages of its appellate brief does Exxon admit to
recouping the "full cost" of the rebates. This is perhaps the most critical fact in dispute. 
If Exxon fully recouped the rebates, as alleged by the named plaintiffs, it necessarily did
so without telling anyone--hence the allegations that Exxon did so "secretly" (and the
company's firm position that no "full cost" recovery occurred). (5)

 Without passing on the merits of any particular claim or defense, we share the trial
court's conclusion that "the controlling issues [in this case] can be proven with common
evidence" because "the focus of the litigation is going to be on Exxon's conduct." See id. 
We believe that Exxon's conduct "will be the object of most of the efforts of the litigants and
the court." Bernal, 22 S.W.3d at 434; Kirkland, 917 S.W.2d at 839. If Exxon recouped the
full value of the rebates, it will be a short inquiry for the finder of fact (based on the same
evidence) to next conclude that Exxon has also misrepresented the truth about the
catch-backs since the inception of its rebate programs. Even in light of Exxon's defenses
of notice and limitations, it is clear that the efforts of the litigants will be directed to the
single issue of whether Exxon recouped the "full value" of the rebates through its
catch-backs. 

 The only defense that we have not yet discussed is release. We have left release
for the end of our analysis because it has been asserted against only one of the named
plaintiffs (Plaintiff Gill). The trial court's order discusses the release signed by Plaintiff Gill. 
See Class Certification Order, pp. 22-23. The court found "it likely that some
substantial portion of the class may well have signed identical releases." Id. at 5. The
order states that, despite discovery requests, Exxon has produced no evidence of any
releases applicable to other class members that would be different in any material respect
from the release signed by Plaintiff Gill. Id. at 22. The order demonstrates the trial court's
consideration of the defense and also shows the court's basis for following federal
precedent allowing class treatment of similar claims:

Exxon must know how many other dealers also signed releases, but it has
not presented any information showing how many other dealers did sign
releases or any different terms in such releases. The Court further takes
notice that in [other] litigation against Exxon that raised many of the same
substantive issues as this case, the Allapattah litigation, in which there were
roughly 10,000 class members, over 5,000 had signed releases, and the
Court found that all but a handful were releases with the same material
terms. Allapattah Services, Inc. v. Exxon, 188 F.R.D. 667, 68-81 & n.24
(S.D. Fla. 1999). 


Id. at 5-6. 

 The existence of affirmative defenses against individual class members does not
necessarily prevent class certification. See Microsoft Corp. v. Manning, 914 S.W.2d 602,
613 (Tex. App.--Texarkana 1995, writ dism'd) (including affirmative defenses of
contributory negligence, superseding cause, and failure to comply with warranty); Dresser
Indus., Inc. v. Snell, 847 S.W.2d 367, 373 (Tex. App.--El Paso 1993, no writ) (including
affirmative defenses of limitations, lack of misrepresentation, and ratification). There is no
question that the trial court considered guiding rules and principles in making its
determination of predominance in light of the defense of release. The court specifically
relied on federal precedent demonstrating that suits such as this are manageable as a
class action. (6)

 In our view, this class comes close to the ideal class described in Bernal, where the
Texas Supreme Court explained that "a judgment in favor of the class members should
decisively settle the entire controversy." Bernal, 22 S.W.3d at 434. If the named plaintiffs
prove that Exxon fully recouped the economic value of the rebates, there will remain
nothing for other members of the class to file but proof of their claims. See id. "The fact
that damages must be computed separately for each class member does not necessarily
mean in itself that individual issues predominate over common issues of law and fact." 
Citgo Ref. & Mktg. v. Garza, 187 S.W.3d 45, 71 (Tex. App.--Corpus Christi 2006, pet.
filed) (citing Sun Coast Resources, Ltd. v. Cooper, 967 S.W.2d 525, 534 (Tex.
App.--Houston [1st Dist.] 1998, pet. dism'd)). 

 As noted above, there is at least one individual question in the case (aside from
damages) that pertains to Plaintiff Gill's release. Although the trial court apparently
anticipated that more class members will surface and have this defense asserted against
them, it nevertheless ruled that common issues will predominate over individual issues. 
Its certification order shows a reasonable and informed thought process for concluding that
the presentation and resolution of individual issues will not be "an overwhelming or
unmanageable task for a single jury." Bernal, 22 S.W.3d at 434. The order demonstrates
actual compliance with Rule 42, including meaningful contemplation of all the defensive
issues asserted by Exxon. 

 It would be improper to reverse the trial court's ruling simply because of an inchoate
possibility that the claims of some class members may yield different answers in light of the
release defense, especially because of the trial court's reference to unanswered discovery
in its analysis of this problem. See Class Certification Order, p. 22. As the Third Court
of Appeals recently explained: 

We accord trial courts an abuse of discretion standard because the class
certification decision occurs early in the litigation process, before the parties
have had the opportunity to fully develop the case and such issues as trial
plan will have only been determined as a preliminary matter. The trial court
must approach the certification decision cautiously in order to balance the
requirements of rule 42 and the difficulties presented by the case's infancy. 
Thus, the trial court's certification order must explain adequately how each
class action claim "could be tried manageably in a class action," in order to
show "actual, demonstrated compliance with Rule 42."


Farmers Ins. Exch. v. Leonard, 125 S.W.3d 55, 60, 69 (Tex. App.--Austin 2003, pet.
denied). For these reasons, we overrule Exxon's challenges to the trial court's certification
ruling as it relates to predominance.

C. Typicality

 The third requirement for class certification is that "[t]he claims or defenses of the
representative parties are typical of the claims or defenses of the class." Tex. R. Civ. P.
42(a)(3). In order to satisfy the typicality requirement, the class representative must
possess the same interests as the class. E. Tex. Motor Freight Sys., Inc. v. Rodriguez,
431 U.S. 395, 403 (1977). To be typical, the claims of class representatives need not be
identical, but they must arise from the same event or course of conduct and must also be
based on the same legal theories. Weatherly v. Deloitte & Touche, 905 S.W.2d 642, 653
(Tex. App.--Houston [14th Dist.] 1995, writ dism'd w.o.j.). 

 Exxon argues that typicality is not met in this case for two reasons. "First, all three
named plaintiffs are not typical of the many Texas dealers who knew and understood that
Exxon factored the cost of its rebates into the prices it charged." Appellant's Brief, p.23. 
"Second, Plaintiff Gill signed a release." Id. According to Exxon, "The release defense
makes typicality impossible, because 'even an arguable defense peculiar to a named
plaintiff' destroys typicality." Id. at 23-24.

 Yet again, we are drawn back to the issue of individual dealer knowledge. Here, if
nowhere else, it is worth noting that the trial court's order specifically addressed Exxon's
evidence of differences in dealer knowledge. See Class Certification Order, pp. 22-23. 
The order states that none of Exxon's evidence pertained to any of the class members in
this case. See id. at 23. In fact, the court described the affiants as having "no listed
connection to this Texas class." Id. Thus, Exxon's "class conflict" is only hypothetical at
this point in the litigation. 

 Exxon has made arguments for why the hypothetical nature of the "class conflict"
should not matter legally on appeal for purposes of defeating certification, but the trial
court's point is still well-taken. An abuse of discretion does not occur where the trial court
bases its decision on conflicting evidence. RSR Corp. v. Hayes, 673 S.W.2d 928, 930
(Tex. App.--Dallas 1984, writ dism'd w.o.j.) (citing Davis v. Huey, 571 S.W.2d 859, 862
(Tex. 1978)). Given the language used in the trial court's order, it might be somewhat of
a stretch to say that there is "conflicting evidence" in this case regarding the differences in
class member knowledge--the trial court having discounted most of the evidence because
it came from non-class members. See Class Certification Order, pp. 23-24. Even if
there were some evidence in the certification record to support Exxon's position, something
rising to the level of "conflicting evidence," there would still be no basis for concluding that
the trial court abused its discretion. See RSR Corp., 673 S.W.2d at 930 (citing Davis, 571
S.W.2d at 862). 

 Exxon also attacks the "typicality" of Plaintiff Gill because he signed the release
discussed above. Again, the trial court's order explains why that fact does not preclude
certification, and again, Exxon argues that the trial court got it wrong. See Class
Certification Order, pp. 4-6; Appellant's Brief, pp. 22-24. On this point, we take note
of a 2002 opinion by the Sixth Court of Appeals that discussed individual defenses such
as release and typicality in reviewing class certification: 

The presence of an "arguable defense unique to the named plaintiff" properly
negates typicality only when "it is predictable" that such defense will become
a "major focus of the litigation," Koos v. First Nat'l Bank, 496 F.2d 1162, 1164
(7th Cir. 1974), such that the named plaintiff "will become distracted by the
presence of a possible defense . . . that the representation of the rest of the
class will suffer," J. H. Cohn & Co. v. Am. Appraisal Assocs., Inc., 628 F.2d
994, 999 (7th Cir. 1980).


Bailey v. Kemper Cas. Ins. Co., 83 S.W.3d 840, 854 (Tex. App.--Texarkana 2002, pet.
denied).

 In light of these guiding rules and principles, we have no basis for concluding that
the trial court abused its discretion in determining that the claims of Plaintiff Gill are typical
of the claims of the class. Exxon's challenge to typicality is overruled. 

D. Adequacy

 The fourth requirement for class certification is that "[t]he representative parties will
fairly and adequately protect the interests of the class." Tex. R. Civ. P. 42(a)(4). Adequacy
of representation is a question of fact and must be determined based on the individual
circumstances of each case. Farmers Ins., 125 S.W.3d at 66; Dresser Industries, 847
S.W.2d at 373. Adequacy of representation is addressed to the sound discretion of the
court. Farmers Ins., 125 S.W.3d at 66; Dresser Industries, 847 S.W.2d at 373. 

 Adequate representation requires an absence of antagonism between the class
representatives and the class members and an assurance the representative parties will
vigorously prosecute the class claims and defenses. Hi-Lo Auto Supply, L.P. v. Beresky,
986 S.W.2d 382, 388 (Tex. App.--Beaumont 1999, no pet.) (citing E & V Slack, Inc. v.
Shell Oil Co., 969 S.W.2d 565, 568 (Tex. App.--Austin 1998, no pet.)). Only a conflict that
goes to the very subject matter of the litigation will defeat a finding of adequacy. Farmers
Ins., 125 S.W.3d at 66; Nissan Motor Co. v. Fry, 27 S.W.3d 573, 583 (Tex. App.--Corpus
Christi 2000, pet. denied). Speculative allegations concerning potential conflicts are
insufficient to show that the trial court abused its discretion in finding the representatives
to be adequate. Farmers Ins., 125 S.W.3d at 66.

 Exxon contends that the certification order must be reversed because (1) "the trial
court ignored conflicts that make certification improper" and (2) "the trial court's analysis
of adequacy disobeys Bernal by shifting the burden to Exxon." Appellant's Brief, pp.
16-20. 

 Once again, Exxon raises individual dealer knowledge--this time for purposes of
challenging adequacy. Here, Exxon contends, that "[b]y building their case on claims of
a 'secret' charge and fraudulent concealment, the plaintiffs made an issue of dealer
knowledge, thereby driving a wedge between dealers who knew about the charge and
dealers who did not. This conflict makes class treatment improper." Id. at 16. Exxon's
brief continues, "The only way for the plaintiffs to try their class action claim--about a
supposedly 'secret' charge--will be to attack the credibility of their fellow dealers. With
many dealers insisting that there was no secret, the three named plaintiffs must insist on
a contrary view. The plaintiffs must attack the testimony of any fellow dealers who would
say there was no secret." Id. at 18.

 Here, we find it appropriate to reiterate that the "class conflict" is still only
hypothetical. The trial court discussed the evidence in its order, and there is nothing that
we can add to that discussion as an appellate court, except to note that adequacy of
representation is a question of fact and must be determined based on the individual
circumstances of each case. See Farmers, 125 S.W.3d at 66; Dresser Industries, 847
S.W.2d at 373. 

 As for Exxon's complaint regarding a "reversal" of the burden of proof, the ultimate
question remains whether the trial court abused its discretion in finding that the named
plaintiffs will provide adequate representation for the class members in this action. Henry
Schein, 102 S.W.3d at 691 (citing Bernal, 22 S.W.3d at 439). Even Exxon seems to
concede that there is no actual evidence of class-member conflict for this Court to review
or discuss. See Appellant's Brief, p. 16 (stating that named plaintiffs were "[u]nable to
make Exxon's evidence of conflicts go away" but citing to no actual evidence in the record
of any conflict between class members). The trial court's order provides a detailed analysis
of the adequacy requirement under Rule 42(a)(4), including reasons for overruling the
specific challenges made by Exxon. See Class Certification Order, pp. 6-8. This Court
is not in a position to substitute its judgment for that of the trial court. We review the
certification order for abuse of discretion. Henry Schein, 102 S.W.3d at 691 (citing Bernal,
22 S.W.3d at 439). We believe that it is apparent on the face of the order that the trial
court did not take a "certify now and worry later" approach to adequacy, as Exxon contends
in its brief. Appellant's Brief, p.22. To the contrary, before certifying the class, the trial
court specifically addressed and rejected Exxon's speculative claims concerning potential
conflicts, finding that they would not frustrate the named plaintiffs' abilities to adequately
represent the class. See Class Certification Order, pp. 6-8. Exxon has shown no
abuse of discretion on this record. 

E. Superiority

 We have discussed the predominance requirement in connection with our analysis
of commonality. In doing so, we did not address the requirement under Rule 42(b)(3) that
class treatment be "superior to other available methods for the fair and efficient
adjudication of the controversy." Tex. R. Civ. P. 42(b)(3). We do so now.

 A class action is superior to other methods of adjudication where any difficulties that
might arise in the management of the class are outweighed by the benefits of class-wide
resolution of common issues. Philadelphia Am. Life Ins. v. Turner, 131 S.W.3d 576, 595
(Tex. App.--Fort Worth 2004, no pet.) (citing Weatherly v. Deloitte & Touche, 905 S.W.2d
642, 654 (Tex. App.--Houston [14th Dist.] 1995, writ dism'd w.o.j.)). Superior means more
than equivalent; the class action must be more fair and efficient than other methods. 
Schein, 102 S.W.3d at 700.

 In its appellate brief, Exxon states, "Our supreme court has not written much on
superiority, so this case would make a good vehicle for this Court to develop law on that
issue." Appellant's Brief, p. 38. The brief continues, "Given the size of the potential
recovery, the American legal market can be counted on to supply entrepreneurial counsel
to prosecute the claims . . . . Because the plaintiffs are knowledgeable people who seek
large damage awards, proceeding as individuals would be at least as efficient as
proceeding as a class." Id. at 39. In addition, "the ability to recover attorney's fees
render[s] plaintiffs' individual claims economically feasible." Id. at 40. 

 Although the size of the potential recovery and the ability to recover attorneys' fees
are relevant considerations, we still operate under an "abuse of discretion" standard,
meaning that at a minimum, we must acknowledge and discuss the trial court's reasons
for finding class treatment to be superior. See Henry Schein, 102 S.W.3d at 691 (citing
Bernal, 22 S.W.3d at 439). Exxon's arguments would have us supplant our view on the
issue of superiority for that of the trial court without even addressing the basis or substance
of the trial court's ruling. Equally disquieting is the disingenuous suggestion made in
Exxon's brief that Exxon would (for some unstated reason) welcome the participation of
"entrepreneurial counsel" in a multitude of individual cases against Exxon based on the
same common issues identified by the trial court's certification order. 

 The order reads in relevant part:

The nature of these claims and the cost and complexity of the litigation
makes it desirable to concentrate this case in one forum, as opposed to
individual cases. It would be inefficient, costly and a waste of judicial
resources, as well as an invitation for conflicting results, to require each class
member to litigate the common issues presented in this cause in multiple
individual cases. Not only would responding to Exxon's defensive pleadings
and arguments likely require an individual litigant to incur legal fees and
costs far in excess of that dealer's damages, but in addition, it would be
extraordinarily wasteful for the judicial system if similar lawsuits had to be
replicated on an individual basis. 


Class Certification Order, p. 26. We find no abuse of discretion in this determination. 

F. Trial Plan & Due Process

 In a final pair of issues that are largely cumulative of the issues above regarding the
specific requirements for class certification under Rule 42, Exxon asks this Court to
de-certify the class because the trial plan "does not explain how Exxon can be given a full
and fair opportunity to present its defenses at trial" and because "the trial plan deprives
Exxon of its constitutional right to due process" "by requiring Exxon to defend against a
fictive composite plaintiff." Appellant's Brief, pp. 40, 43. Although these arguments are
distinct from those discussed above, they are nevertheless premised on the same two
analogies, one to fraud and the other to HRN, already considered and rejected by this
Court. 

 The issues are also based on the same hypothetical conflict between class
members that we have already discussed and rejected. Perhaps most fundamentally, the
issues are based on Exxon's contention that there can be no "common proof" on class
issues because Exxon will produce evidence at trial (there is none yet) to show that
different class members knew different things about DTT pricing and the rebate programs. 
Exxon has not explained how this knowledge would be relevant at trial. Exxon denies the
allegations of the named plaintiffs that it fully recouped the cost of the rebate programs. 
If the named plaintiffs succeed in establishing that Exxon did fully recoup the costs, it is
unclear how individual dealer knowledge of a partial recoup practice would change the
result of the trial. It is equally unclear why the trial plan should be held deficient for not
discussing evidence that may not be relevant or admissible at trial. For these reasons, we
overrule the final two issues presented in Exxon's brief. 

V. Conclusion

 Having reviewed all claims for relief, we conclude that the trial court did not abuse
its discretion in certifying this class of plaintiffs. The trial court's order shows actual,
demonstrated compliance with Rule 42. It is obvious from the order that the trial court
conducted a rigorous analysis, including in-depth consideration of the various objections
to class certification made by Exxon. Some of the issues presented in this appeal have
been matters of controlling substantive law on which no deference is given to the trial court. 
In these determinations, we have found no error. Other appellate issues presented by
Exxon are addressed to the discretion of the trial court, with limited room for appellate
review. On these, too, we have found no grounds for reversing the class certification order. 

 The order is therefore AFFIRMED. 



 

 DORI CONTRERAS GARZA,

 Justice


Opinion delivered and filed this 

the 12th day of April, 2007.

1. The following facts are provided in Exxon's appellate brief and are uncontested by the named
plaintiffs on appeal. See Tex. R. App. P. 38.1(f). 
2. A trial court abuses its discretion if it (1) acts arbitrarily or unreasonably; (2) does not properly apply
the law to the undisputed facts; or (3) rules on factual assertions not supported by the record. See Wal-Mart
Stores v. Lopez, 93 S.W.3d 548, 553 (Tex. App.--Houston [14th Dist.] 2002, no pet.). An abuse of discretion
does not exist if the trial court bases its decision on conflicting evidence. RSR Corp. v. Hayes, 673 S.W.2d
928, 930 (Tex. App.--Dallas 1984, writ dism'd w.o.j.) (citing Davis v. Huey, 571 S.W.2d 859, 862 (Tex. 1978)).
3. The named plaintiffs' second amended class petition makes the following allegation: 


Each of the Plaintiffs and Class Members has been damaged by the full amount of the
promised rebates of which he, she, or it has been deprived, consisting of the overcharges
represented by the hidden adders to the DTT, through which EXXONMOBIL surreptitiously
took back all of the rebates.

4. Exxon has not argued that the terms of the contracts depend on an individual dealer's knowledge
or understanding of the catch-back practice. This is consistent with longstanding precedent from the Texas
Supreme Court holding that a claimant's rights to recover under a contract are controlled by the parties'
objective, not subjective, intent. See, e.g., City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515,
518 (Tex. 1968). 
5. The appellate brief filed by the named plaintiffs makes the following argument:


[W]hether Exxon really told its dealers about the rebate add-ons is a common question that
should be tried on a classwide basis . . . . Exxon is essentially saying that it believes a
dealer's knowledge gives Exxon an affirmative defense against that dealer. Yet the issue is
Exxon's own honesty . . . . 


When Exxon recouped its rebate costs by adding the average per-gallon cost onto its DTT
prices, all class members were overcharged . . . . The representatives claim that they are
entitled to recover the per-gallon DTT add-ons that Exxon imposed, in violation of its UCC
obligations. Class members are in the same situation, with the same claim based on the
same misconduct . . . . 


[T]his case turns on Exxon's contractual promises, not individual dealer knowledge . . . 
Dealer knowledge is not irrelevant, of course, in the following sense: If the facts supported
it (they don't), Exxon might argue that it communicated the DTT add-ons to dealers as a
group, so as to refute any allegation of corporate bad faith. In this sense, the knowledge of
dealers as a group might be relevant to an argument that Exxon's uniform pricing practices
were honest rather than dishonest. However, that is not what Exxon is saying. Rather,
Exxon is saying that each individual dealer's state of knowledge is relevant to Exxon's own
honesty or dishonesty. There is zero law to support that approach - which is why Exxon
would rather talk about fraud cases, where individual reliance can be an issue. 


Brief of Appellees, pp. 23, 25-26, 29, 31-32.

6. Some of the arguments Exxon makes in this appeal seem similar to the arguments Exxon made on
appeal in Allapattah. See Allapattah Servs. v. Exxon Corp., 333 F.3d 1248, 1261 (11th Circ. 2003). The
Eleventh Circuit Court of Appeals rejected Exxon's arguments in that case, and the United States Supreme
Court denied certiorari. As the Eleventh Circuit explained:


Exxon's primary argument in support of its contention that the class should not have been
certified is that there were individual issues inherent in each dealer's breach of contract claim
and its own affirmative defenses. We find that Exxon's argument that each breach of
contract claim raised an individual issue is without merit. Because all of the dealer
agreements were materially similar and Exxon purported to reduce the price of wholesale gas
for all dealers, the duty of good faith was an obligation that it owed to the dealers as a whole.
Whether it breached that obligation was a question common to the class and the issue of
liability was appropriately determined on a class-wide basis.


Thus, the real question for the district court was whether the common issue of liability
predominated over the individual issues raised by Exxon's affirmative defenses, which
pertained primarily to the issue of damages rather than liability. In similar situations,
numerous courts have recognized that the presence of individualized damages issues does
not prevent a finding that the common issues in the case predominate. We agree. Based
upon the facts of this case, we believe that Exxon's liability to the class for breach of the
dealer agreements predominated over the individual issues relating to damages.


Id. at 1261 (internal citations omitted).